## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW MEXICO

| | |
|---|---|
| **MARK LACY, M.D.** and **CHRISTIAN MEDICAL & DENTAL ASSOCIATIONS**, | |
| Plaintiffs, | |
| v. | |
| **HECTOR BALDERAS**, in his official capacity as Attorney General of the State of New Mexico; **DAVID R. SCRASE, M.D.**, in his official capacity as Acting Secretary of the New Mexico Department of Health; and **KAREN CARSON, M.D., ERIC ANDERSON, M.D., STEVEN M. JENKUSKY, M.D., PETER T. BEAUDETTE, M.D., EILEEN BARRETT, M.D., MARK EDWARD UNVERSAGT, M.D., BRADLEY SCOGGINS, D.O., KRISTIN REIDY, D.O., KATHY JOHNSON, P.A.,** and **BUFFIE SAAVEDRA**, in their official capacities as members of the New Mexico Medical Board. | Case No. 1:22-cv-00953 **VERIFIED COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF** |
| Defendants. | |

## INTRODUCTION

1. For thousands of years, medical ethics have categorically condemned physician-assisted suicide. This commitment is embodied in the Hippocratic Oath, which requires physicians to swear: "I will neither give a deadly drug to anybody if asked for it, nor will I make a suggestion to this effect."[1]

---

[1] Ludwig Edelstein, *The Hippocratic Oath: Text, Translation and Interpretation*, ANCIENT MEDICINE, SELECTED PAPERS 3, 6 (Johns Hopkins Univ. Press 1967).

2.      Still today, the American Medical Association's (AMA) Code of Medical Ethics holds that "[p]hysician assisted suicide is fundamentally incompatible with the physician's role as healer, would be difficult or impossible to control, and would pose serious societal risks." AM. MED. ASS'N, CODE OF MED. ETHICS § 5.7, available at https://bit.ly/35gicR9.

3.      Consistent with millennia of medical ethics, "for over 700 years, the Anglo-American common-law tradition has punished or otherwise disapproved of both suicide and assisting suicide." *Washington v. Glucksberg*, 521 U.S. 702, 711 (1997). "By the time the Fourteenth Amendment was ratified [in 1868], it was a crime in most States to assist a suicide." *Id.* at 715. And nearly a hundred years later, the first Model Penal Code included assisted suicide as a crime. Thaddeus Pope, *Legal History of Medical Aid in Dying: Physician Assisted Death in U.S. Courts and Legislatures*, 48 N.M. L. REV. 267, 272 (2018).

4.      For nearly 60 years, the State of New Mexico made it a crime for physicians to deliberately assist a patient in taking his or her own life. N.M. STAT. ANN. § 30–2–4 (West 1963); *see Morris v. Brandenburg*, 2016-NMSC-027, ¶ 1, 376 P.3d 836 (N.M. 2016).

5.      Despite historic condemnations of physician-assisted suicide, in 2021 New Mexico enacted the Elizabeth Whitefield End-of-Life Options Act ("the Act"), to legalize and promote assisted suicide. *See* N.M. STAT. ANN. § 24-7C-1, *et seq* (2021).

6.      The Act purports to protect physicians who object to assisted suicide for reasons of conscience, saying they will not be required to "participate." But that promise rings hollow. The Act does not define the word "participate," requires conscientious objectors to facilitate suicide in material ways, and expressly prohibits

professional associations like CMDA from taking action to ensure that their members advance—rather than undermine—their mission and message.

7.    The Act compels objecting physicians to speak and inform terminally ill patients about the availability of assisted suicide. N.M. STAT. ANN. § 24-7C-6.

8.    The Act forces objecting physicians to refer their patients to physicians or organizations who are "able and willing to carry out" the patient's assisted suicide. N.M. STAT. ANN. § 24-7C-7(C).

9.    The Act expressly prohibits professional associations like CMDA from suspending, denying, or revoking membership to physicians who participate in assisted suicide, violating CMDA's right to associate with members who will present a consistent message. *Id.* at § 24-7C-7(B).

10.    The State of New Mexico thus compels objecting health care professionals to speak a certain message about assisted suicide, and forces them to provide proximate, formal, and material cooperation in an unethical and sinful act.

11.    If physicians refuse to inform patients about assisted suicide or refuse to refer patients to providers and entities who are able and willing to participate, they violate the Act and face substantial civil, administrative, and professional liability. They also risk losing their medical licenses.

12.    Plaintiff Christian Medical & Dental Associations ("CMDA"), a national association of conscientious Christian health care professionals whose personal religious convictions and professional ethics oppose the practice of assisted suicide, brings this action on behalf of its members. Plaintiff Mark Lacy, M.D., a physician and CMDA member, brings this action on behalf of himself. (Unless otherwise specified, "CMDA" includes individual Plaintiff Dr. Lacy throughout this Complaint).

13.     CMDA members and Dr. Lacy believe that life is sacred and full of inherent value bestowed by our Creator; that physician-assisted suicide ends an innocent human life without justification; and that facilitating physician-assisted suicide in any way, including by informing patients about it and referring patients to providers who will perform it, constitutes material cooperation with the underlying act, is sinful, and violates Plaintiffs' religious exercise.

14.     The Act thus puts CMDA members and Dr. Lacy to an impossible choice: (a) surrender their religious, moral, and ethical convictions and facilitate assisted suicide by informing patients about the option and referring patients to participating providers, or (b) refuse to inform patients about assisted suicide and refuse to refer patients to participating providers and violate the Act, subjecting themselves to substantial liability and the possibility of losing their medical licenses and careers.

15.     This Court should enjoin these provisions of the Act and declare them unconstitutional.

## JURISDICTION AND VENUE

16.     This action arises under the Constitution and laws of the United States. The Court has subject-matter jurisdiction under the 42 U.S.C. § 1983 and 28 U.S.C. § 1331 (federal question). The Court has jurisdiction to render declaratory and injunctive relief under 28 U.S.C. §§ 2201 and 2202 and Fed. R. Civ. P. 65, and to award reasonable attorneys' fees and costs under 42 U.S.C. § 1988.

17.     Venue lies in this district pursuant to 28 U.S.C. § 1391 because Defendants are residents of this district and a substantial part of the events giving rise to Plaintiffs' claims occurred in this district.

## PLAINTIFFS

### A.  CMDA and Its Members

18.    CMDA is a national nonprofit, professional organization whose members are Christian physicians and allied health care professionals. CMDA has approximately 13,000 members nationally. Its headquarters is in Tennessee.

19.    CMDA members include physicians who are domiciled and licensed in New Mexico, including Mark Lacy, M.D.

20.    CMDA sues on behalf of its New Mexico members.

21.    CMDA members' practice of health care is founded on, compelled by, and central to, their Christian religious beliefs.

22.    CMDA members believe that human life is a gift from God and is sacred because it bears God's image; that human life has worth because Jesus Christ redeemed it; and that human life has meaning because God has an eternal purpose for it.

23.    CMDA members live out their Christian beliefs in their practice of health care, including their belief about the sanctity of human life.

24.    As such, CMDA members oppose intervention with the intent to produce death for the relief of pain, suffering, or economic considerations, or for the convenience of patient, family, or society.

25.    CMDA members oppose physician-assisted suicide in any form.

26.    CMDA as a whole seeks to express this belief about the sanctity of life and opposition to physician-assisted suicide to the public.

27.    It would violate CMDA members' consciences, religious beliefs, and expressive message to participate in assisted suicide in any way, including by (a) referring patients to health care providers who perform assisted suicide, (b) referring

patients to a person or organization who would help find a physician willing to perform assisted suicide, and (c) providing information regarding assisted suicide. Thus, CMDA members will not perform these acts.

28.    CMDA members believe that informing patients about physician-assisted suicide and referring patients to providers who will perform it constitutes complicity and material cooperation in physician-assisted suicide, facilitates the unjustified taking of life, is sinful, and therefore violates their religious beliefs.

29.    CMDA members in New Mexico include physicians who often treat patients with terminal diseases, including those who work in the hospice setting or specialize in oncology, cardiology, infectious diseases, internal medicine, and family medicine.

30.    Most CMDA members report that they would rather stop practicing medicine than engage in action that violates their conscience, including participating in assisted suicide in any way.

31.    CMDA policy empowers the professional association to take disciplinary action—including termination of membership—for any member whose conduct is incompatible with its faith, mission, and position statements.

32.    Given its complete opposition to assisted suicide, CMDA would take disciplinary action—including denial or termination of membership—for health care providers who participate in assisted suicide.

## B.    Dr. Mark Lacy

33.    Dr. Mark Lacy is a CMDA member, licensed medical doctor and Associate Professor of Internal Medicine and Infectious Diseases at the University of New Mexico Hospital in Albuquerque, New Mexico. Dr. Lacy recently accepted an

offer to serve as an Infectious Disease Specialist at Christus St. Vincent's Hospital in Santa Fe, New Mexico, and will begin working there full-time on December 15, 2022.

34.     Dr. Lacy specializes in infectious diseases, pediatrics, and internal medicine. He is certified by the American Board of Internal Medicine, American Board of Internal Medicine (Infectious Diseases), and the American Board of Pediatrics.

35.     Dr. Lacy has practiced medicine for 39 years.

36.     Dr. Lacy practices medicine, in part, because his Christian beliefs instruct that he care for the physical, mental, emotional, and spiritual well-being of others. He thus uses his expertise and skill to care for others.

37.     Dr. Lacy seeks to live out his Christian beliefs in his practice of health care, including his belief in the sanctity of human life.

38.     It would violate Dr. Lacy's conscience and religious beliefs to participate in assisted suicide in any way, including by (a) referring patients to health care providers who would perform assisted suicide, (b) referring patients to a person or organization who would help find a physician willing to perform assisted suicide, or (c) providing information regarding assisted suicide. Thus, Dr. Lacy will not perform these acts.

39.     In his role as a full-time physician, Dr. Lacy regularly sees terminally ill patients and engages in discussions with them about their diagnosis, prognosis, and treatment options. These responsibilities will continue in Dr. Lacy's new role at Christus St. Vincent's Hospital.

40.     Since the Act has been in effect, Dr. Lacy has treated and advised dozens of terminally ill patients, but he has not informed—and will not inform—them about assisted suicide as a potential treatment option.

41.    In his role as a full-time physician, Dr. Lacy has witnessed firsthand that terminally ill patients with severe pain can have dramatic changes in disposition once their pain or other forms of distress are controlled.

42.    In his role as a full-time physician, Dr. Lacy has witnessed firsthand that terminally ill patients can experience physical, mental, or emotional distress that is temporary, yet which lasts longer than two days.

43.    In his role as a full-time physician, Dr. Lacy has witnessed firsthand that terminally ill patients can experience mental, emotional, and spiritual exhaustion that leaves them vulnerable to being easily manipulated by family members into a course of action that the family members want for the patient, even if it conflicts with the patient's own desires.

44.    Dr. Lacy has personally received a request for medication from a terminally ill patient to help kill himself. Because of Dr. Lacy's religious, moral, and ethical beliefs, he refused the request and instead prescribed appropriate medication to address that patient's illness. That patient passed away peacefully just a few days later without pain or distress.

45.    In addition to his religious beliefs that assisted suicide is morally unacceptable, Dr. Lacy also asserts that participating in assisted suicide in any way would conflict with his best medical professional judgment and medical ethics.

46.    Dr. Lacy was not aware of the Act's referral and informational requirements until late September 2022.

47.    If Dr. Lacy is forced to facilitate or participate in assisted suicide in violation of his conscience, religious beliefs, and medical ethics, he would leave the profession or relocate from the State of New Mexico.

**DEFENDANTS**

48.    Defendant Hector Balderas is the Attorney General of New Mexico. He is sued in his official capacity only.

49.    Defendant Balderas enforces New Mexico's laws, including the Act; prosecutes actions on behalf of state officers, departments, boards, and commissions; and prosecutes and defends actions in the state interest. *See,* N.M. STAT. ANN. §§ 8-5-2, 61-6-22 (2022).

50.    Defendant David R. Scrase, M.D. is the Acting Cabinet Secretary for the New Mexico Department of Health. He is sued in his official capacity only.

51.    The Department of Health, which Defendant Scrase leads, is empowered to ensure accessibility of assisted suicide and to enforce New Mexico health laws, regulations, and professional standards relating to the practice of medicine, including the Act. *See* N.M. STAT. ANN. § 24-1-3(K), (M).

52.    Defendant Scrase enforces the laws with which the Department of Health is charged and otherwise may issue orders, act, and sue to protect the public health. *See* N.M. STAT. ANN. §§ 9-7-6, 24-1-3(K), (M).

53.    Defendants Karen Carson, M.D., Eric Anderson, M.D., Steven M. Jenkusky, M.D., Peter T. Beaudette, M.D., Eileen Barrett, M.D., Mark Edward Unversagt, M.D., Bradley Scoggins, D.O., Kristin Reidy, D.O., Kathy Johnson, P.A., and Buffie Saavedra are members of the New Mexico Medical Board and are sued in their official capacities only.

54.    The New Mexico Medical Board is empowered to enforce New Mexico laws, regulations, and professional standards relating to the practice of medicine, including the Act. *See* N.M. STAT. ANN. § 61-6-1(B); § 24-7C-7 (limiting immunity from licensing sanctions and professional disciplinary action to those whose refusal

9

participate is otherwise in "compliance" with the Act's informational and referral requirements).

55.    The Medical Board can deny, revoke, and suspend medical licenses, may issue fines, censures, and reprimands, and otherwise enforces and administers laws related to the practice of medicine. See N.M. STAT. ANN. §§ 61-6-1(C); 61-6-5, 61-6-15, 61-6-15.1, 61-6-20, 61-6-22.

## FACTUAL BACKGROUND

### A.    Physician-assisted suicide has long been recognized as unethical.

56.    For 2,500 years the medical profession has forbidden doctors from giving patients lethal drugs. Society relies on this prohibition and trusts physicians to be healers when possible, and to provide comfort when healing is no longer possible.

57.    In the last 40 years, hospice and palliative care organizations within the medical community have sought greater control over the physical, psychological, social, and spiritual distresses that so often affect individuals approaching death and their families. The common goal is life with dignity until natural death occurs.

58.    This commitment has historically been embodied in the Hippocratic Oath, versions of which members take upon entering the profession.

59.    Various translations of the original Oath are available, but they all contain something like the following: "I will neither give a deadly drug to anybody if asked for it, nor will I make a suggestion to this effect." Ludwig Edelstein, *The Hippocratic Oath: Text, Translation and Interpretation*, Ancient Medicine, Selected Papers 3, 6 (Johns Hopkins Univ. Press 1967).

60.    Respect for conscientious objections by medical professionals in the context of taking life has been specifically recognized by the U.S. Supreme Court, including in *Roe v. Wade*, in which the Supreme Court quoted the AMA House of

Delegates resolution that, "[N]o physician or other professional personnel shall be compelled to perform any act which violates his good medical judgment. Neither physician, hospital, nor hospital personnel shall be required to perform any act violative of personally-held moral principles." 410 U.S. 113, 143 n. 38 (1973), *overruled on other grounds by Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228 (2022).

61.     Despite coming under attack from time to time, the idea that a health care professional should not be forced to participate in acts that violate their "good medical judgment" or "personally-held moral principles" has long been widely accepted, as reflected in federal appropriations protections for conscientiously objecting health care professionals that have been passed since the 1970s, such as the Church Amendment (42 U.S.C. §§ 300a-7(b)–(e)), the Weldon Amendment (Sec. 507(d) of Title V of Division H (Departments of Labor, Health and Human Services, and Education, and Related Agencies Appropriations Act) of the Consolidated Appropriations Act, 2016 Pub. L. No. 114-113), and provisions of the Affordable Care Act (42 U.S.C. §§ 18023(b)(4), 18113(a)).

62.     For example, the Church Amendment provides:

> No individual shall be required to perform or assist in the performance of any part of a health service program or research activity funded in whole or in part under a program administered by the Secretary of Health and Human Services if his performance or assistance in the performance of such part of such program or activity would be contrary to his religious beliefs or moral convictions.

42 U.S.C. § 300a-7(d).

63.     Specific to assisted suicide, the Affordable Care Act provides:

> The Federal Government, and any State or local government or health care provider that receives Federal financial assistance under this Act (or under an amendment made by this Act) or any health plan created

11

under this Act (or under an amendment made by this Act), may not subject an individual or institutional health care entity to discrimination on the basis that the entity does not provide any health care item or service furnished for the purpose of causing, or for the purpose of assisting in causing, the death of any individual, such as by assisted suicide, euthanasia, or mercy killing.

42 U.S.C. § 18113(a).

64.    When the U.S. Supreme Court took up the issue of whether a "fundamental right" to physician-assisted suicide exists in *Washington v. Glucksberg*, it agreed with the AMA that "[p]hysician-assisted suicide is fundamentally incompatible with the physician's role as healer." 521 U.S. 702, 731 (1997) (quoting AMA, CODE OF MED. ETHICS § 2.211 (1994)).

65.    Today the AMA's Code of Ethics still holds that "[p]hysician assisted suicide is fundamentally incompatible with the physician's role as healer, would be difficult or impossible to control, and would pose serious societal risks." AMA, CODE OF MED. ETHICS § 5.7.

66.    And the AMA's Code of Medical Ethics, in § 1.1.7, confirms the importance of physicians' conscience:

Preserving opportunity for physicians to act (or refrain from acting) in accordance with the dictates of conscience in their professional practice is important for preserving the integrity of the medical profession as well as the integrity of the individual physician, on which patients and the public rely. Thus physicians should have considerable latitude to practice in accord with well-considered, deeply held beliefs that are central to their self-identities.

## B.    New Mexico's "End-of-Life Options Act"

67.    Despite the historical prohibition against physician participation in suicide, and the present prohibition in the AMA's Code of Medical Ethics, the Elizabeth Whitefield End-of-Life Options Act took effect in 2021, legally authorizing the practice of assisted suicide in New Mexico. *See* N.M. STAT. ANN. § 24-7C-1, *et seq.*

68.    The Act authorizes a prescribing health care provider—such as a licensed physician, nurse practitioner, or physician assistant—to "provide a prescription for medical aid in dying medication" to an individual that, when taken, will end that individual's life. N.M. STAT. ANN. § 24-7C-3.

69.    The Legislature itself recognized that the Act effectively legalized assisted suicide because it had to redefine "assisting suicide" in its criminal code to ensure health care providers would not be charged with a felony for prescribing suicide drugs pursuant to the Act. *See* 2021 N.M. Laws Ch. 132, Sec. 10 (amending § 30-2-4 of New Mexico's criminal code by redefining "assisting suicide" to not include "aiding another in the taking of [their] own life" if "acting in accordance with the provisions of the End-of-Life Options Act.").

70.    Before participating in assisted suicide under the Act, a health care provider must satisfy certain statutory requirements. The health care provider must:

a)    determine the individual seeking assisted suicide has capacity, a terminal illness, voluntarily requested assisted suicide, and the ability to self-administer the suicide drug prescribed by the provider;

b)    provide appropriate medical care to the individual;

c)    determine the individual is making an informed decision;

d)    ensure the individual is not being coerced or unduly influenced;

e)    notate in the individual's medical record that the prescribing provider has determined the individual qualifies to receive the physician-assisted suicide;

f)    notate in the individual's medical record that a physician has determined the individual has capacity, a terminal illness, and the ability to self-administer the suicide drug;

g)    affirm the individual is enrolled in a certified hospice-program, or affirm that a consulting health care provider has confirmed the individual has a terminal illness; and

    h) have the individual complete a "Request for Medication to End My Life in a Peaceful Manner" form and enter the same in the individual's medical record.

N.M. STAT. ANN. § 24-7C-3; *see also id.* § 24-7C-2 (defining terms used in the Act).

71.    Health care providers can even perform assisted suicide on individuals who have had past mental-health disorders or intellectual disabilities, so long as a mental health professional evaluates such an individual first. *Id.* § 24-7C-4.

72.    The Act contains a provision for conscientious objectors, which states that "[n]o health care provider who objects for reasons of conscience to participating in the provision of medical aid in dying shall be required to participate in the provision of medical aid in dying under any circumstance." *Id.* § 24-7C-7(C)

73.    But the very same provision states that conscientious objectors must still inform patients of their objection and must *refer* an individual to a health care provider who will perform the assisted suicide, or to a person or organization that will help the requester find a provider willing to perform the assisted suicide. *Id.*

74.    Specifically, that provision states:

If a health care provider is unable or unwilling to carry out an individual's request pursuant to the End-of-Life Options Act, that health care provider shall so inform the individual and refer the individual to a health care provider who is able and willing to carry out the individual's request or to another individual or entity to assist the requesting individual in seeking medical aid in dying.

*Id.* (below "the Referral Requirement").

75.    Despite objections to physician-assisted suicide, a health care provider must also "inform a terminally ill patient of all reasonable options related to the patient's care that are legally available to terminally ill patients that meet the medical standards of care for end-of-life care." *Id.* § 24-7C-6 (below "the Informing Requirement").

14

76.    In other words, the Informing Requirement compels a health care provider to tell a patient about the option of assisted suicide, regardless of the provider's ethical, medical, moral, conscientious, or religious objections to the practice.

77.    The Act also provides that "[a] person shall not be subject to criminal liability, licensing sanctions or other professional disciplinary action for . . . refusing to participate" in assisted suicide, but only if that person complies in good faith with the other provisions of the Act—including the Referral and Informing Requirements. *Id.* § 24-7C-7(A).

78.    Accordingly, a health care provider who refuses to facilitate assisted suicide and cannot comply with other provisions of the Act (including the Referral or Informing Requirements) lacks any protection from "criminal liability, licensing sanctions, and other professional disciplinary action." *Id.* (requiring that conscientious objectors nonetheless maintain "good faith compliance" with the Act's provisions).

79.    In sum, both the Referral and Informing Requirements require objecting health care providers to facilitate and materially cooperate with assisted suicide on pain of civil, administrative, and professional liability. *See id.* § 61-6-15 (Medical Board's authority to revoke, suspend, fine, censure, and reprimand); § 61-3-28 (Board of Nursing's same authority for certified nurse practitioners); § 61-6-20 (criminal penalties under the Medical Practice Act); § 9-7-6 (authorizing the Secretary to take administrative and civil enforcement action).

80.    In addition, the Act prohibits a "professional organization or association" from "subject[ing] a person to . . . loss or denial of . . . privileges or

membership . . . for participating" in assisted suicide. *Id.* § 24-7C-7(B) (below the "Membership Requirement").

81.    The Membership Requirement prohibits professional associations from conditioning membership on agreement not to participate in assisted suicide or from revoking membership for members who participate in assisted suicide.

## C.    The Act's effect on the Plaintiffs

82.    In his role as a physician, Dr. Lacy routinely diagnoses and treats terminal diseases and often must assess life expectancy.

83.    Other New Mexico physicians who are CMDA members also routinely diagnose and treat terminal diseases and often must assess life expectancy.

84.    Dr. Lacy and CMDA physician members treat patients who constitute "qualified individual[s]" under the Act. *See id.* §§ 24-7C-2(H), 24-7C-3.

85.    Under the Act's Referral Requirement, if one of Dr. Lacy's or a CMDA physician member's patients requests assisted suicide, they are required to tell the patient of their refusal to perform the assisted suicide and then refer that patient either to a health care provider who is "able and willing" to perform assisted suicide or to another person or entity that will help the patient find such an "able and willing" physician, even though this would violate Dr. Lacy's or the CMDA physician member's sincerely held religious beliefs and their professional oath, ethics, and duties. *See id.* § 24-7C-7(C).

86.    And under the Act's Informing Requirement, Dr. Lacy and CMDA physician members *must* inform terminally ill patients about the option of assisted suicide, whether or not those patients ask about such a possibility, even though this would violate their sincerely held religious beliefs and their professional oath, ethics, and duties. *See id.* § 24-7C-6.

87.    The Informing Requirement thus increases the likelihood that one of Dr. Lacy's or CMDA physician members' patients will request that they perform assisted suicide, thereby increasing the likelihood that they must also comply with Referral Requirement.

88.    The Membership Requirement prevents CMDA from disciplining, suspending, denying, or terminating membership for individuals who participate in assisted suicide, even though CMDA policy allows such discipline because assisted suicide is contrary to CMDA's ethical and religious beliefs and undermines its collective message opposing assisted suicide.

89.    If Dr. Lacy, CMDA members, or CMDA itself refuses to comply with the Informing, Referral, and Membership Requirements, they face imminent harm in the form of Medical Board disciplinary action, administrative proceedings, and civil enforcement.

90.    Moreover, the Act forces physicians to affirm that assisted suicide may be indicated for a six-months "terminal" condition, which suggests that assisted suicide is an appropriate response to a diagnosis of a terminal illness.

91.    Dr. Lacy and CMDA physician members strenuously disagree that assisted suicide is an appropriate response to illness or injury as a matter of medical practice and ethics, and they desire to either engage in speech that discourages assisted suicide or to remain silent on the subject.

92.    The Act's requirement of physician affirmation of suicide is particularly concerning because patients put their trust in physicians and healthcare professionals and tend to regard their statements with a heightened degree of credibility.

93.    Requests for physician-assisted suicide under the Act are not uncommon. In its first year on the books, more than 100 individuals died by assisted suicide under the Act. *See* Compassion & Choice, *More than 100 New Mexicans Used Medical Aid in Dying Since Law Went Into Effect A Year Ago*, (June 22, 2022), https://compassionandchoices.org/news/nmanni062222 (last accessed Dec. 12, 2022).

94.    Plaintiffs are committed to engage in a course of conduct that violates the Act. They will exercise their religious beliefs and free speech by refusing to inform patients about assisted suicide, refusing to refer patients to "able and willing" physicians or other entities, and for CMDA's part, refusing to associate with members who perform or facilitate assisted suicide.

95.    Plaintiffs' intended course of conduct is affected with constitutional interests—their refusal to provide information or referrals is rooted in their First Amendment rights.

96.    Plaintiffs' current and intended course of conduct is prohibited by the Informing, Referral, and Membership Requirements.

97.    Plaintiffs face a credible threat of enforcement by Defendants for refusing to comply with the Informing, Referral, and Membership Requirements: the Act was signed into law recently; requests under the Act are common; Dr. Lacy and CMDA physicians often interact with terminally ill patients; Dr. Lacy has been requested to facilitate a patient's death in the past; Defendants have broad powers to regulate Dr. Lacy's and other CMDA physicians' licenses; Plaintiffs' current and intended conduct violates the Act; and Defendants have not disavowed enforcement under the Act.

98.    Plaintiffs also face a credible threat of enforcement because their potential liability and professional discipline is inherent in the manner they intend

to conduct themselves—intending not to comply with the Informing, Referral, or Membership Requirements.

99.    The Act and Defendants' enforcement and threatened enforcement of it are actions taken under color of state law.

100.    Plaintiffs will suffer irreparable harm by the loss of their constitutionally guaranteed rights of freedom of speech, free exercise of religion, due process, equal protection, and expressive association unless the Act's Informing, Referral and Membership Requirements are enjoined.

101.    The Act is imposing and will continue to impose irreparable harm upon Plaintiffs' constitutional rights unless it is enjoined and declared unconstitutional.

## FIRST CAUSE OF ACTION

### Violation of the First Amendment's Free Speech Clause

102.    Plaintiffs repeat and reallege each of the foregoing allegations in paragraphs 1 through 101 of this Complaint.

103.    The First Amendment's Free Speech Clause protects Plaintiffs' rights to be free from content and viewpoint discrimination and to be free from laws that compel them to speak messages with which they disagree.

### *Compelled Speech*

104.    The Act facially and as applied deprives CMDA members, including Dr. Lacy, of their right not to speak the State's message on the subject of assisted suicide.

105.    The Referral Requirement facially compels all New Mexico physicians who object to assisted suicide—including Plaintiffs—to (a) tell patients of their unwillingness to perform assisted suicide *and* (b) refer patients to either a health care provider who will perform assisted suicide or to an entity who will help patients find a provider willing to perform assisted suicide. *See* N.M. STAT. ANN. § 24-7C-7(C).

19

106.    The Informing Requirement facially compels all New Mexico physicians—including Plaintiffs—to inform terminally ill patients about the possibility and availability of assisted suicide, despite any religious, ethical, and medical objections to participating in any way in assisted suicide. *See id.* § 24-7C-6.

107.    Thus, the Act facially requires all New Mexico physicians—including Plaintiffs—to speak the government's preferred messages about assisted suicide by informing patients about it, informing patients of the physician's objection, and referring patients to providers or entities who are willing to facilitate it.

108.    Failure to comply with the Referral and Informing Requirements leaves New Mexico physicians—including CMDA members and Dr. Lacy—subject to civil, administrative, and professional liability.

### *Content and Viewpoint Discrimination*

109.    The Act facially discriminates based on content and viewpoint because it protects physicians from liability if they choose to speak about and participate in assisted suicide, and also protects physicians who refuse to participate but nonetheless inform patients about assisted suicide and refer them to providers willing to provide it, but the Act does not protect physicians—including CMDA members and Dr. Lacy—who refuse to participate in assisted suicide in any way and who will not refer for or provide information about assisted suicide.

110.    The Act facially discriminates based on content and viewpoint because the Informing Requirement deems assisted suicide as meeting the "medical standards of care for end-of-life care" and thereby prohibits speech that disagrees, such as speech that discourages and condemns assisted suicide.

*Overbreadth*

111.  These speech requirements are facially overbroad, requiring all physicians in New Mexico—including CMDA members and Dr. Lacy—to speak the government's preferred message on assisted suicide in ways well beyond what is necessary to serve any legitimate or compelling state interest.

112.  The Act is not narrowly tailored to serve a compelling, significant, legitimate, or even valid state interest.

113.  Defendants have no sufficient justification for discriminating against conscientiously objecting physicians and compelling them to facilitate assisted suicide or speak the government's pro-suicide message as required by the Act.

114.  CMDA members and Dr. Lacy do not have an adequate remedy at law.

115.  Defendants are empowered to enforce New Mexico laws, regulations, and professional standards relating to the practice of medicine.

116.  CMDA and Dr. Lacy accordingly seek a declaration that the Act's Referral and Informing Requirements are unconstitutional facially and as applied, and injunctive relief restraining Defendants from enforcing the Referral and Informing Requirements or from punishing health care providers for refusing to comply with them.

## SECOND CAUSE OF ACTION

### Violation of the First Amendment's Free Exercise Clause

117.  Plaintiffs repeat and reallege each of the foregoing allegations in paragraphs 1 through 101 of this Complaint.

118.  The First Amendment of the United States Constitution protects New Mexico physicians—including CMDA members' and Dr. Lacy's—with respect to their rights to the free exercise of their religious beliefs.

119.    CMDA members and Dr. Lacy exercise their religion by speaking against assisted suicide, by remaining silent on the subject, and by refusing to facilitate or participate in assisted suicide in any way, including by providing information about it or referring patients to providers or entities who will help the patient commit suicide.

120.    CMDA members and Dr. Lacy believe that any form of participation in assisted suicide—including informing patients about it and referring patients to providers who will perform it—is a sinful and unethical act that makes them complicit in suicide, which violates their religious exercise.

121.    The Referral and Informing Requirements substantially burden CMDA members' and Dr. Lacy's religious exercise by forcing them to facilitate and participate in assisted suicide on pain of civil, administrative, and professional penalties.

122.    The Referral and Informing Requirements also facially impose a substantial burden on all New Mexico physicians who refuse to participate in assisted suicide for religious reasons.

123.    The Referral and Informing Requirements force religiously objecting New Mexico physicians—including CMDA members and Dr. Lacy—to choose between violating their religious beliefs or risking government punishment.

124.    The Referral and Informing Requirements are not neutral or generally applicable because the Act allows exceptions for physicians who object to performing assisted suicide but who do not object to speaking about and referring patients to obtain assisted suicide.

125.    The Act is underinclusive because it exempts from penalty physicians who are willing to facilitate assisted suicide *in some way*—whether through

prescribing suicide drugs, informing patients about assisted suicide, or referring patients to a provider who will prescribe suicide drugs—but it does not exempt from penalty physicians who refuse to facilitate assisted suicide in *any* way.

126.   The Act therefore treats some comparable secular conduct better than religious conduct and is underinclusive to achieving any purported state interest. *See Tandon v. Newsom*, 141 S. Ct. 1294, 1296 (2021); *Fulton v. City of Philadelphia,* 141 S. Ct. 1868, 1877 (2021).

127.   The Referral and Informing Requirements are also not neutral or generally applicable because the decision to impose penalties for failure to comply are decided through subjective ad hoc discretionary decisions on a case-by-case basis, creating a mechanism for individualized exemptions. *See Axson-Flynn v. Johnson,* 356 F.3d 1277, 1297–99 (10th Cir. 2004); *see also* N.M. STAT. ANN. § 61-6-15 (giving the Medical Board broad discretion to impose disciplinary action, including the ability to reduce punishment to only probation "for good cause shown").

128.   And the Referral and Informing Requirements are not neutral and generally applicable because they target physicians whose religious beliefs prohibit participating in assisted suicide in *any* way, singling them out for different treatment while protecting physicians with religious beliefs that permit facilitating or participating in assisted suicide in *some* way.

129.   Because the Referral and Informing Requirements are not neutral and generally applicable, they trigger strict scrutiny.

130.   The Referral and Informing Requirements also trigger strict scrutiny under the "hybrid-rights" exception to *Smith's* neutrality and general applicability rule. Plaintiffs have colorable companion constitutional claims under the Free Speech, Due Process, and Equal Protection Clauses, in which Plaintiffs have a fair

probability or likelihood of success on the merits. *See Axson-Flynn*, 356 F.3d at 1295–97.

131.    The Referral and Informing Requirements do not serve any compelling government interests.

132.    The Referral and Informing Requirements are not narrowly tailored to achieve any purported compelling government interests.

133.    The Referral and Informing Requirements are not even rationally related to any legitimate government interests.

134.    CMDA members and Dr. Lacy have no adequate remedy at law.

135.    Defendants are empowered to enforce New Mexico laws, regulations, and professional standards relating to the practice of medicine.

136.    CMDA and Dr. Lacy accordingly seek a declaration that the Act's Referral and Informing Provisions are unconstitutional facially and as applied, and injunctive relief restraining Defendants from enforcing them or from punishing health care providers for refusing to comply with them.

### THIRD CAUSE OF ACTION

### Violation of the Fourteenth Amendment's Due Process Clause

137.    Plaintiffs repeat and reallege each of the foregoing allegations in paragraphs 1 through 101 of this Complaint.

138.    The Due Process Clause of the Fourteenth Amendment guarantees New Mexico physicians—including CMDA members and Dr. Lacy—the right to due process of law, which includes the right to be free from vague guidelines that no reasonable person in their position could understand.

139.    The terms and provisions of the Act are facially unconstitutionally vague and ambiguous, and subject CMDA members and Dr. Lacy to civil and professional disciplinary action that could deprive them of their livelihoods.

140.    The terms and provisions of the Act are facially vague and ambiguous because no reasonable health care professional in CMDA members' and Dr. Lacy's position could understand the meaning of the terms "terminal illness" as defined in the Act or the term "participating" as used in the Act.

141.    The term "participating" is repeatedly used in the Act yet is not defined and a reasonable health care professional could not understand how one must "participate" in assisted suicide and to what extent refusing to "participate" is lawful under the Act.

142.    The term "terminal illness" is vague and ambiguous because no reasonable health care professional in CMDA members' and Dr. Lacy's position could know whether a disease or condition is in fact incurable and irreversible.

143.    Further, the phrase, "determined that the individual has . . . a terminal illness" as used in N.M. STAT. ANN. § 24-7C-3 along with the term "terminal illness" as defined in N.M. STAT. ANN. § 24-7C-2, is vague and ambiguous because no reasonable health care professional in CMDA members' and Dr. Lacy's position could know whether it means a disease or condition that will "result in death within six months" with treatment or without treatment, or whether a disease or condition is likely to "result in death within six months" to any degree of medical certainty.

144.    In fact, a national study of live discharges from hospices in 2010 found that, despite statistical variations based on geography hospice composition, about 1 in 5 hospice patients were discharged alive. Joan M. Teno, et al., *A National Study of*

*Live Discharges from Hospice*, 17 J. OF PALLIATIVE MED. 1121, 1121-1127 (Oct. 2014), https://bit.ly/3LP57z1.

145. Similarly, no reasonable health care professional in CMDA members' and Dr. Lacy's position could understand the meaning of the phrase "inform a terminally ill patient of all reasonable options related to the patient's care that are legally available to terminally ill patients that meet the medical standards of care for end-of-life care." N.M. STAT. ANN. § 24-7C-6.

146. Whether an option is "reasonable" and "related to the patient's care" depends on the medical expertise of the treating physician. *Id.*

147. And it is vague and ambiguous how much, and what type of, information a physician must provide to patients under the statute.

148. CMDA members and Dr. Lacy have no adequate remedy at law.

149. Defendants are empowered to enforce New Mexico laws, regulations, and professional standards relating to the practice of medicine.

150. CMDA and Dr. Lacy accordingly seek a declaration that the Act's above provisions are unconstitutionally vague and thus invalid facially and as applied, and injunctive relief restraining Defendants from enforcing them or from punishing health care providers for refusing to comply with them.

## FOURTH CAUSE OF ACTION

## Violation of the Fourteenth Amendment's Equal Protection Clause

151. Plaintiffs repeat and reallege each of the foregoing allegations in paragraphs 1 through 101 of this Complaint.

152. The Equal Protection Clause of the Fourteenth Amendment guarantees New Mexico physicians—including CMDA members and Dr. Lacy—equal protection of the laws.

153.   The Act facially discriminates between physicians who are willing to facilitate and participate in assisted suicide and similarly situated physicians who are not willing to facilitate or participate in assisted suicide in any way.

154.   The Act also facially discriminates between physicians who refuse to participate in assisted suicide but are willing to refer for and provide information about it, and similarly situated physicians who refuse to participate and are unwilling to refer for and provide information about it.

155.   The Act protects from criminal, civil, administrative, and professional liability New Mexico physicians who facilitate and participate in assisted suicide, or who refer for and provide information about it. *Id.* § 24-7C-7(A).

156.   The Act provides that "[p]articipating in medical aid in dying shall not be the basis for a report of unprofessional conduct," but contains no statement that *refusal* to participate shall not be the basis for a report of unprofessional conduct. N.M. Stat. Ann. § 24-7C-7(H).

157.   Facially, and as applied to CMDA members, including Dr. Lacy, this intentionally treats CMDA members less favorably than similarly situated participating physicians and non-participating physicians who nonetheless do not object to providing information about assisted suicide or referring for it.

158.   The disparate treatment is based on CMDA members' exercise of fundamental rights: their speech content and deeply held Christian religious beliefs.

159.   Defendants do not have a sufficient justification for singling out conscientiously objecting physicians, including CMDA members and Dr. Lacy, for potential liability for their refusal to participate in assisted suicide.

160.   CMDA members and Dr. Lacy have no adequate remedy at law.

161.    Defendants are empowered to enforce New Mexico laws, regulations, and professional standards relating to the practice of medicine.

162.    CMDA and Dr. Lacy accordingly seek a declaration that the Act's Referral and Informing Requirements are unconstitutional facially and as applied, and injunctive relief restraining Defendants from enforcing them or from punishing health care providers for declining to abide by them.

## FIFTH CAUSE OF ACTION

### Violation of the First Amendment's Right to Expressive Association

163.    Plaintiffs repeat and reallege each of the foregoing allegations in paragraphs 1 through 101 of this Complaint.

164.    The First Amendment protects the right of people "to associate with others in pursuit of . . . religious . . . ends." *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 647 (2000).

165.    The First Amendment prohibits the government from forcing people to associate with others in an association expressing messages.

166.    CMDA is an expressive association. Its very existence is dedicated to the collective expression and propagation of shared ethical, moral, and religious ideals.

167.    Because CMDA is an organization made up of individuals, every member is expected to and does express CMDA's ethical, moral, and religious ideals.

168.    CMDA thus only accepts for membership like-minded people who will express CMDA's collective message to the public.

169.    CMDA members agree that assisted suicide is contrary to their ethical, moral, and religious beliefs.

170.    CMDA policy allows the professional association to take disciplinary action—including denial, suspension, or termination of membership—for individuals

28

who facilitate and participate in assisted suicide. CMDA intends to take such disciplinary action, but the Membership Requirement prohibits CMDA from doing so.

171.    The Membership Requirement thus forces CMDA to associate with individuals who not agree with its ethical, moral, and religious views on physician-assisted suicide.

172.    The forced inclusion of disagreeing members undermines CMDA's ability to express its collective message.

173.    The Membership Requirement does not serve any compelling or even valid interest in a narrowly tailored way by infringing on CMDA's freedom of expressive association.

## PRAYER FOR RELIEF

WHEREFORE, CMDA and Dr. Lacy respectfully request that this Court enter judgment against Defendants and provide CMDA and Dr. Lacy with the following relief:

(A)    Enter a judgment declaring that the Act's Referral and Informing Requirements, both facially and as applied:

- compel speech,

- are content-based and viewpoint-based restrictions on speech,

- are overbroad,

- infringe upon New Mexico physicians' free exercise rights,

- are vague and ambiguous, and violate the guarantee of due process,

- violate the guarantee of equal protection,

- and are therefore unconstitutional in violation of the First and Fourteenth Amendments to the United States Constitution, as pled above.

(B)    Enter a judgment declaring that the Act's Membership Requirement, as applied, violates CMDA's right to expressive association in violation of the First Amendment to the United States Constitution.

(C)    Enter preliminary and permanent injunctive relief prohibiting Defendants, or anyone acting in concert with them, from applying the Informing, Referral, or Membership Requirements and from launching any civil, criminal, administrative, disciplinary, or professional proceedings against CMDA or its members, including Dr. Lacy, for failure to comply with the requirements.

(D)    Award Plaintiffs attorneys' fees and costs under 42 U.S.C. § 1988 and the Court's equitable powers.

(E)    Award all other relief as the Court may deem just and proper.

Respectfully submitted this 14th day of December, 2022.

By: */s/ Mark A. Lippelmann*

MARK A. LIPPELMANN, AZ BAR NO. 36553
ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, AZ 85260
(480) 444-0020
(480) 444-0028 Fax
mlippelmann@adflegal.org

JACOB E. REED, VA BAR NO. 97181*
ALLIANCE DEFENDING FREEDOM
44180 Riverside Pkwy
Leesburg, VA 20176
(571) 707-4655
(571) 707-4656 Fax
jreed@adflegal.org

DENISE M. HARLE, GA BAR NO. 176758*
ALLIANCE DEFENDING FREEDOM
1000 Hurricane Shoals Road NE, Suite D-1100
Lawrenceville, Georgia 30043
(770) 339-0774
(770) 339-6744 Fax
dharle@adflegal.org

*Attorneys for Plaintiffs*

*\* Pro Hac Vice admission forthcoming*

## VERIFICATION OF COMPLAINT

I, Jeffrey Barrows, D.O., a citizen of the United States and a resident of the State of Tennessee, as Senior Vice President of Bioethics and Public Policy for CMDA, hereby declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that I have read the foregoing Verified Complaint and the factual allegations therein, and the facts as alleged are true and correct.

Executed this 13th day of December, 2022, in New Smyrna Beach, Florida.

*/s/ Jeffrey Barrows, D.O.*
Jeffrey Barrows, D.O.

## VERIFICATION OF COMPLAINT

I, Mark Lacy, M.D., a citizen of the United States and a resident of the State of New Mexico, hereby declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that I have read the foregoing Verified Complaint and the factual allegations therein, and the facts as alleged are true and correct.

Executed this 13th day of December, 2022, in Bernalillo County, New Mexico.

*/s/ Mark Lacy, M.D.*
Mark Lacy, M.D.