# EXHIBIT A

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CHRISTIAN MEDICAL AND DENTAL ASSOCIATION, et al.,<br><br>                     Plaintiffs,<br><br>    v.<br><br>ROB BONTA, et al.,<br><br>                    Defendants. | Case No. 5:22-cv-00335-FLA (GJSx)<br><br>**ORDER GRANTING IN PART PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION [DKT. 50]**<br><br>Date:       July 8, 2022<br>Time:      1:30 p.m.<br>Courtroom:  6B |

## **RULING**

Before the court is Plaintiffs Christian Medical & Dental Associations ("CMDA") and Leslee Cochrane's ("Cochrane") (collectively, "Plaintiffs") Motion for Preliminary Injunction ("Motion"). Dkt. 50. For the reasons stated herein, the court GRANTS in part Plaintiffs' Motion.

## **BACKGROUND**

On February 22, 2022, Plaintiffs filed this action against Defendants Rob Bonta, Attorney General of California, in his official capacity ("Bonta"), and Tomás J. Aragón, M.D., Dr. P.H., in his official capacity as the Director of the California

Department of Public Health and the State Public Health Officer ("Aragón") (collectively, the "State Officer Defendants"), and Michelle Bholat, M.D., Ryan Brooks, Randy W. Hawkins, M.D., James M. Healzer, M.D., Nicole Jeong J.D., Kristina D. Lawson, J.D., Laurie Rose Lubiano, J.D., Asif Mahmood, M.D., David Ryu, Richard E. Thorp, M.D., Veling Tsai, M.D., and Eserick Watkins, in their official capacities as members of the Medical Board of California[1] (collectively, the "MBC Defendants") (all together, "Defendants"), seeking an order restraining Defendants from enforcing certain provisions of Senate Bill No. 380 ("SB 380") as unconstitutional. *See generally* Dkt. 1 ("Compl."). Plaintiffs bring four causes of action for declaratory and injunctive relief for alleged violations of: (1) freedom of speech under the First Amendment, (2) free exercise of religion under the First Amendment, (3) due process under the Fourteenth Amendment, and (4) equal protection under the Fourteenth Amendment. *Id.*[2]

Plaintiffs plead the following factual allegations in the Complaint. CMDA is a national, nonprofit organization of Christian physicians and allied health care

---

[1] On August 10, 2022, the court granted the parties' joint stipulation to substitute the new members of the Medical Board of California, Michelle Bholat, M.D., Nicole Jeong J.D., and Veling Tsai, M.D. for previous members Alejandra Campoverdi, Dev GnanaDev, M.D., and Felix C. Yip, M.D. Dkt. 102.

[2] Defendants request the court take judicial notice of certain documents. *See* Dkts. 54, 56. Plaintiffs did not file a response and do not appear to oppose the request. A court may take judicial notice of court filings and other matters of public record, *see Harris v. County of Orange*, 682 F.3d 1126, 1132 (9th Cir. 2012), as well as well-known medical facts, *Barnes v. Indep. Auto. Dealers Ass'n Health & Benefit Plan*, 64 F.3d 1389, 1395 n. 2 (9th Cir. 1994), and the existence of American Medical Association ethics opinions, *Pac. Kidney & Hypertension, LLC v. Kassakian*, 156 F. Supp. 3d 1219, 1227 n. 7 (D. Or. 2016). The court, therefore, GRANTS Defendants' Requests for Judicial Notice with respect to the identified portions of the legislative history of SB 380 and the American Medical Association, Code of Medical Ethics. *See* Dkt. 54 at 2-3, ¶¶ 1-8; Dkt. 56 at 2-3, ¶¶ 1-8. The court DENIES the requests with respect to the JAMA Network article (Dkt. 54 at 3, ¶ 9; Dkt. 56 at 3, ¶ 9), as the content of that article is not properly the subject of judicial notice. *See* Fed. R. Evid. 201.

professionals. *Id.* ¶ 7. CMDA members oppose the practice of assisted suicide based on their personal religious convictions and professional ethics. *Id.* ¶ 3. More than ninety percent of CMDA members would rather stop practicing medicine than participate in assisted suicide. *Id.* ¶ 11. Cochrane is a CMDA member and full-time hospice physician in California, who is board certified in family medicine with a certificate of additional qualification in hospice and palliative medicine. *Id.* ¶ 12. Cochrane is employed as a physician in a hospice that does not provide assisted suicide. *Id.* ¶¶ 14-15. As part of his job responsibilities, Cochrane routinely serves as the attending physician for terminally ill patients, and engages in discussions with terminally ill patients regarding their diagnosis, prognosis, and treatment options. *Id.* ¶¶ 14, 65. Cochrane believes it would violate his conscience and religious beliefs to participate in assisted suicide in any way. *Id.* ¶ 13.

The California End of Life Option Act (the "Act"), Cal. Health & Safety Code §§ 443-443.22 (Cal. Health & Safety Code Division 1, Part 1.85),[3] which was enacted in 2015 and went into effect in 2016, allows terminally ill Californians who satisfy certain criteria to obtain aid-in dying drugs. In relevant part, the Act permits a qualifying individual to obtain a prescription for an aid-in-dying drug after submitting two oral requests, a minimum of 48 hours apart, and a written request to his or her attending physician. Cal. Health & Safety Code § 443.3(a). Before prescribing an aid-in-dying drug, the attending physician must perform all the acts enumerated in Section 443.5(a), including making an initial determination of whether the requesting adult has a terminal disease and the capacity to make medical decisions, and confirming the individual is making an informed decision that his or her request does not arise from coercion or undue influence by another person. *Id.* § 443.5(a).

---

[3] All subsequent statutory references shall be to the California Health and Safety Code unless otherwise specified.

The original version of the Act clearly noted that "[p]articipation in activities authorized pursuant to this part shall be voluntary" and recognized that "a person or entity that elects, for reasons of conscience, morality, or ethics, not to engage in activities authorized pursuant to this part is not required to take any action in support of an individual's decision under this part." *Id.* § 443.14(e)(1) (2015). The Act further specified that non-participating health care providers would not be subject to any disciplinary action for refusing to participate. *Id.* § 443.14(e)(2) (2015).[4]

In October 2021, the California Legislature enacted SB 380, which amended the Act effective January 1, 2022. The current version of the Act continues to provide that participation is voluntary, but adds that nonparticipating providers are not excused from compliance with certain requirements:

> Participation under this part shall be voluntary …, a person or entity that elects, for reasons of conscience, morality, or ethics, not to participate is not required to participate under this part. This subdivision does not limit the application of, or excuse noncompliance with, paragraphs (2), (4), and (5) of this subdivision or subdivision (b), (i), or (j) of Section 443.15, as applicable.

*Id.* § 443.14(e)(1) (2022).

The amended Act specifies:

> A health care provider who objects for reasons of conscience, morality, or ethics to participate under this part shall not be required to participate. If a health care provider is unable or unwilling to participate under this part, as defined in subdivision (f) of Section 443.15, the provider shall, at a minimum, inform the individual that they do not participate in the End of Life Option Act, document the individual's date of request and provider's notice to the individual of

---

[4] Section 443.14(e)(2), as enacted in 2015, stated in relevant part, "a health care provider is not subject to civil, criminal, administrative, disciplinary, employment, credentialing, professional discipline, contractual liability, or medical staff action, sanction, or penalty or other liability for refusing to participate in activities authorized under this part, including, but not limited to, refusing to inform a patient regarding his or her rights under this part, and not referring an individual to a physician who participates in activities authorized under this part."

their objection in the medical record, and transfer the individual's
relevant medical record upon request.

*Id.* § 443.14(e)(2) (2022). A non-participating health care provider's documentation of an individual's oral request for an aid-in-dying drug qualifies as one of the two oral requests required under Section 443.3(a).

In addition, Section 443.14(e)(4) clarifies that a provider who is "unable or unwilling to carry out a qualified individual's request under this part" shall provide the individual's relevant medical records to the individual, and "upon the individual's request, timely transfer[]" the individual's medical records "with documentation of the date of the individual's request for a prescription for aid-in-dying drug in the medical record." Cal. Health & Safety Code § 443.14(e)(4).[5]

Plaintiffs filed the instant Motion on April 1, 2022, seeking a preliminary injunction enjoining Defendants from enforcing provisions of Sections 443.14 and 443.15, which Plaintiffs contend require health care professionals to discuss, refer for, or otherwise participate in assisted suicide. *See generally* Dkt. 50-3. Plaintiffs contend SB 380 infringes on their constitutional rights under the First and Fourteenth Amendments, and, thus, constitutes irreparable injury. *See* Dkt. 50-1 ("Mot.") at 24. The Motion came to hearing on July 8, 2022. Dkt. 95.

## DISCUSSION

### I.    Legal Standard

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). A party seeking a preliminary injunction must establish that: (1) it "is likely to succeed on the merits," (2) it "is likely to suffer irreparable harm in the absence of preliminary relief," (3) "the

---

[5] Section 443.14(e)(5) mandates "[a] health care provider or a health care entity shall not engage in false, misleading, or deceptive practices relating to a willingness to qualify an individual or provide a prescription to a qualified individual under this part."

balance of equities tips in [its] favor," and (4) "an injunction is in the public interest." *Id.* at 20. "Where the government is a party to a case in which a preliminary injunction is sought, the balance of the equities and public interest factors merge." *S. Bay United Pentecostal Church v. Newsom*, 985 F.3d 1128, 1149 (9th Cir. 2021).

Alternatively, the Ninth Circuit has found an injunction may be appropriate when the moving party has raised "serious questions going to the merits" and "the balance of hardships tips sharply in [plaintiff's] favor." *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131-32 (9th Cir. 2011). The "[l]ikelihood of success on the merits is the most important *Winter* factor"; thus, "if a movant fails to meet this threshold inquiry, the court need not consider the other factors, in the absence of serious questions going to the merits." *Disney Enters., Inc. v. VidAngel, Inc.*, 869 F.3d 848, 856 (9th Cir. 2017) (quotations omitted).

## II. Analysis

### A. The End of Life Option Act Requirements

When interpreting a statute, the court's inquiry begins and ends with the statutory text if the language is unambiguous. *BedRoc Ltd., LLC v. United States*, 541 U.S. 176, 183 (2004). The court is "not guided by a single sentence or member of a sentence, but look[s] to the provisions of the whole law, and to its object and policy." *Dole v. United Steelworkers of Am.*, 494 U.S. 26, 35 (1990) (quotation marks omitted). If the language of the statute is unclear, then the court turns to the legislative history. *See Blum v. Stenson*, 465 U.S. 886, 896 (1984).

Here, the parties disagree about the extent of the requirements imposed by SB 380. Plaintiffs argue SB 380 requires physicians, including those who object, to participate in assisted suicide by:

    a. Documenting the date of a patient's initial assisted suicide request;

    b. Providing information to a patient about the availability of assisted suicide;

    c. Informing the patient that the physician does not participate in assisted suicide;

d. Transferring the patient's records, including documentation of that first oral request, to a subsequent physician who may participate in assisted suicide; and

e. Providing a requesting patient with a referral to another health care provider for the purpose of providing assisted suicide.

Mot. 4-5.

Defendants argue that the only requirements imposed on non-participating providers are those enumerated in Section 443.14(e)(2), not the acts of non-participation identified in Section 443.15(f)(3). Dkt. 53 ("State Officer Defendants' Opp'n") at 9-10; Dkt. 55 ("MBC Opp'n") at 9-10. According to Defendants, Section 443.15(f)(3) concerns the rights and obligations of health care entities and their control over employees and contractors, and does not impose any affirmative obligations on health care providers. State Officer Defendants' Opp'n 9-11; MBC Opp'n 9-11.

At the hearing, Plaintiffs clarified they only object to the requirement that a health care provider document a patient's initial request for aid-in-dying drugs under Section 443.14(e)(2) and the conduct stated in Section 443.15(f)(3), which they believe is mandated by the Act. Plaintiffs expressly stated they do not object to the requirements that a non-participating health care provider shall (1) inform an individual the provider does not participate in the Act and (2) transfer an individual's medical records upon request. Additionally, Plaintiffs stated they would not object to the documentation requirement if it did not count as one of the two oral requests required for a qualifying individual to obtain aid-in-dying drugs under Section 443.3(a).

The court begins by looking to the text of the statute. Section 443.14(e)(1) explicitly provides that "[p]articipation under this part [Cal. Health & Safety Code Division 1, Part 1.85 (the Act)] shall be voluntary," and "a person or entity that elects, for reasons of conscience, morality, or ethics, not to participate is not required to participate under this part." Cal. Health & Safety Code § 443.14(e)(1). This section,

however, "does not limit the application of, or excuse noncompliance with, paragraphs (2), (4), and (5) of this subdivision or subdivision (b), (i), or (j) of Section 443.15, as applicable." *Id.*

The parties do not dispute, and this court agrees, that Subdivision (e)(2) requires that a non-participating provider shall: (1) "inform the individual that they do not participate in the End of Life Option Act," (2) "document the individual's date of request and provider's notice to the individual of their objection in the medical record," and (3) "transfer the individual's relevant medical record upon request." *Id.* § 443.14(e)(2). In addition, Subdivision (e)(4) provides, "[i]f a health care provider is unable or unwilling to carry out a qualified individual's request under this part and the qualified individual transfers care to a new health care provider or health care entity, the individual's relevant medical records shall be provided to the individual and, upon the individual's request, timely transferred with documentation of the date of the individual's request for a prescription for aid-in-dying drug in the medical record, pursuant to law." *Id.* § 443.14(e)(4). Subdivision (e)(5) provides, "[a] health care provider or a health care entity shall not engage in false, misleading, or deceptive practices relating to a willingness to qualify an individual or provide a prescription to a qualified individual under this part." *Id.* § 443.14(e)(5).

Section 443.15, Subdivisions (b), (i), and (j) impose requirements on health care entities that are not relevant to Plaintiffs' claims here. *See id.*, § 443.15(b), (i), (j). Aside from Subdivision (f), all provisions of Section 443.15 concern the obligations of a health care entity under the Act.[6] *See id.* § 443.15(f). Section 443.15(f) provides

---

[6] Section 443.15(a) states, in relevant part, "[s]ubject to subdivision (b), … a health care provider may prohibit its employees, independent contractors, or other persons or entities, including other health care providers, from participating in activities under this part while on premises owned or under the management or direct control of that prohibiting health care provider or while acting within the course and scope of any employment by, or contract with, the prohibiting health care provider."

definitions that apply to the Act in its entirety. *Id.*[7] Subdivision (f)(2) sets forth the definition of "participating," and states:

> "Participating, or entering into an agreement to participate, under this part," means doing or entering into an agreement to do any one or more of the following:
>
> > (A) Performing the duties of an attending physician as specified in Section 443.5.
> >
> > (B) Performing the duties of a consulting physician as specified in Section 443.6.
> >
> > (C) Performing the duties of a mental health specialist, in the circumstance that a referral to one is made.
> >
> > (D) Delivering the prescription for, dispensing, or delivering the dispensed aid-in-dying drug pursuant to paragraph (2) of subdivision (b) of, and subdivision (c) of, Section 443.5.
> >
> > (E) Being present when the qualified individual takes the aid-in-dying drug prescribed pursuant to this part.

*Id.* § 443.15(f)(2) (2022).

Section 443.15(f)(3), in turn, specifies conduct excluded from the definition of "participating," and states:

> "Participating, or entering into an agreement to participate, under this part" does not include doing, or entering into an agreement to do, any of the following:
>
> > (A) Diagnosing whether a patient has a terminal disease, informing the patient of the medical prognosis, or determining whether a patient has the capacity to make decisions.
> >
> > (B) Providing information to a patient about this part.
> >
> > (C) Providing a patient, upon the patient's request, with a referral to another health care provider for the purposes of participating under this part.

---

[7] Section 443.15(f) supplements the definitions set forth in Section 443.1.

*Id.* § 443.15(f)(3) (2022).[8]

Plaintiffs contend that because the conduct identified in Subdivision (f)(3) is excluded from the definition of "participating" under the Act, "[t]he allowance for not having to 'participate,' as now defined by SB 380, is drafted so narrowly" that SB 380 requires Plaintiffs to perform the conduct stated to avoid facing "civil, criminal, administrative, disciplinary, employment, credentialing, professional discipline, contractual liability, or medical staff action, sanction, or penalty or other liability." Mot. 9. The court disagrees.

Section 443.14, on its face, immunizes health care providers for "participating in good faith compliance with [the Act] or for refusing to participate in accordance with subdivision (b). Cal. Health & Safety Code § 443.14(b). The statutory language does not impose any affirmative requirements beyond those stated in Section 443.14(e)(2), (4), and (5). Although Section 443.15(f)(3) defines "participation" to exclude certain acts, the Act does not require non-participating providers to take part in these acts or impose any other affirmative requirements on non-participating providers. *See* Cal. Health & Safety Code §§ 443.14, 443.15(f).

To the contrary, Section 443.14(b) expressly states that "[a] health care provider, health care entity, or professional organization or association shall not subject an individual to censure, discipline, suspension, loss of license, loss of privileges, loss of membership, or other penalty for participating in good faith compliance with this part or for refusing to participate in accordance with subdivision (e)." *Id.* § 443.14(b) (emphasis added). There is nothing in the statutory language to suggest that a non-participating health care provider is obligated to or can be disciplined or penalized for failing to engage in conduct outside of what is expressly required under Section 443.14(e). Subdivision (e)(3) expressly states that a non-

---

[8] The current version of Section 443.15(f) is substantially identical to the 2015 version of the Act, except that the 2015 version used the language "activities under this part" rather than "under this part" in the definitions.

participating provider cannot be sanctioned, penalized, or held liable for refusing to participate under the Act. *Id.* § 443.14(e)(3). The fact that Section 443.14 does not expressly immunize or excuse a non-participating provider from having to engage in additional conduct that falls outside the scope of the statute cannot be read as an obligation for the provider to perform such conduct.

Accordingly, the court finds that the only affirmative requirements imposed on non-participating providers are those identified in Section 443.14(e)(2), (4), and (5). The court, therefore, will only consider the parties' arguments regarding these requirements in determining whether Plaintiffs are likely to succeed on the merits of their claim. Because the court finds the plain language of the statute is unambiguous, the court does not consider the legislative history of the Act or the parties' arguments thereto.

**B.    Standing**

Article III of the Constitution requires courts to adjudicate only actual cases or controversies. *See* U.S. Const. art. III, § 2, cl. 1. "A suit brought by a plaintiff without Article III standing is not a 'case or controversy,' and an Article III federal court therefore lacks subject matter jurisdiction over the suit." *Cetacean Cmty. v. Bush*, 386 F.3d 1169, 1174 (9th Cir. 2004). To establish standing, a plaintiff must show he "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). A plaintiff must clearly allege facts demonstrating each element at the pleading stage. *Id.* To establish injury in fact, a plaintiff must show he suffered "an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992) (internal citations and quotation marks omitted).

In determining whether the threatened enforcement of a law creates an Article III injury, the court considers whether plaintiff alleges "an intention to engage in a

1   course of conduct arguably affected with a constitutional interest, but proscribed by a
2   statute, and there exists a credible threat of prosecution thereunder." *Susan B.*
3   *Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014) (quotation marks and citation
4   omitted). "[A]n actual arrest, prosecution, or other enforcement action is not a
5   prerequisite to challenging the law." *Id.* at 158.

6       Defendants argue Plaintiffs lack standing because they have not alleged a
7   concrete injury and merely speculate that they may suffer injury in the future. State
8   Officer Defendants' Opp'n 6; MBC Opp'n 6. According to Defendants, as there is no
9   threat of enforcement and the Medical Board of California ("MBC") has not taken any
10  disciplinary action against anyone for violations of the Act, Plaintiffs are asking the
11  court to "determine the constitutionality of a state law in a hypothetical situation
12  where it is not even clear the State itself would consider its law applicable."[9] *Id.*
13  (citing *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 382 (1992)) (brackets
14  omitted). The court disagrees.

15      Plaintiffs allege that compliance with the Act interferes with their
16  Constitutional rights to freedom of speech, free exercise of religion, due process, and
17  equal protection. Compl. ¶ 69. Plaintiffs also contend that CMDA members,
18  including Cochrane, intend to violate SB 380 because they cannot comply with the
19  Act's requirements due to their religious and moral convictions. Dkt. 62 ("Reply to
20  State Officer Defendants' Opp'n") at 6-7. Indeed, Plaintiffs state Cochrane is a
21  hospice physician who sees terminally ill patients on a daily basis, and frequently
22  interacts with patients who may make a request for aid-in-dying drugs. Compl. ¶ 14.
23  According to Cochrane, it would violate his sincerely held religious beliefs and be a

24  _____

25  [9] Defendants also argue Plaintiffs' claims are not ripe because they have not alleged
26  any enforcement has occurred or is threatened, and that the "constitutional analysis in
    this case would benefit greatly from the factual amplification that comes with actual
27  enforcement." State Officer Defendants' Opp'n 7; MBC Opp'n 7. For the same
    reasons that Plaintiffs have standing to adjudicate their claims, Defendants' ripeness
28  argument fails.

1    violation of his professional oath, ethics, and duties to document a patient's request

2    for aid-in-dying drugs, as is required under Section 443.14(e)(2) and (4).  *Id.* ¶ 66.

3    Section 443.14(e)(1) does not excuse Cochrane and other CMDA members' failure to

4    comply with the requirements of these provisions of the Act.  Cal. Health & Safety

5    Code § 443.14(e)(1).

6         For purposes of the subject Motion, Plaintiffs' statement that they intend to

7    refuse to comply with the requirements of Section 443.14(e)(2) and (4) is sufficient to

8    establish an actual injury sufficient to establish standing.  *See Susan B. Anthony List*,

9    573 U.S. at 159.  Plaintiffs do not need to wait for enforcement of the Act to have

10   standing to challenge the statute.  *See id.*  Accordingly, the court finds Plaintiffs have

11   standing to seek a preliminary injunction on the subject Motion.

12        **C.    Plaintiffs' Likelihood of Success on the Merits of Their**

13            **Constitutional Claims**

14            *1.    Free Exercise Clause*

15        "The Free Exercise Clause of the First Amendment, applicable to the States

16   under the Fourteenth Amendment, provides that 'Congress shall make no law …

17   prohibiting the free exercise' of religion."  *Fulton v. City of Philadelphia*, 141 S. Ct.

18   1868, 1876 (2021).  "[L]aws incidentally burdening religion are ordinarily not subject

19   to strict scrutiny under the Free Exercise Clause so long as they are neutral and

20   generally applicable."  *Id.* (citing *Employment Div., Dep't of Human Res. of Or. v.*

21   *Smith*, 494 U.S. 872, 878-82 (1990)).  "Government fails to act neutrally when it

22   proceeds in a manner intolerant of religious beliefs or restricts practices because of

23   their religious nature."  *Id.* at 1877.  "[I]f the object of a law is to infringe upon or

24   restrict practices because of their religious motivation, the law is not neutral, and it is

25   invalid unless it is justified by a compelling interest and is narrowly tailored to

26   advance that interest."  *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508

27   U.S. 520, 533 (1993) (citation omitted).  Should a plaintiff make an initial showing

28   that a law is not "neutral" or "generally applicable," the court must find a First

13

Amendment violation unless the government can satisfy "strict scrutiny" by demonstrating its course was justified by a compelling state interest and was narrowly tailored in pursuit of that interest. *Kennedy v. Bremerton Sch. Dist.*, 142 S. Ct. 2407, 2422 (2022).

To determine if the object of a law is neutral, courts first evaluate whether the law discriminates on its face. *Lukumi*, 508 U.S. at 533-34. "A law lacks facial neutrality if it refers to a religious practice without a secular meaning discernable from the language or context." *Id.* at 533. However, "[f]acial neutrality is not determinative" and the court also considers whether the law's object is to infringe upon or restrict practices because of their religious motivation. *Id.* A law operates in a neutral manner where it does "not suppress, target, or single out the practice of any religion because of religious content." *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1131 (9th Cir. 2009). "The Free Exercise Clause is not violated even though a group motivated by religious reasons may be more likely to engage in the proscribed conduct." *Id.*

Plaintiffs contend SB 380 violates the Free Exercise Clause because it treats secular physicians better than religious physicians and treats some religious beliefs more favorably than others. Mot. 7. In particular, Plaintiffs argue physicians who participate in the Act are protected from disciplinary action, while protections for religiously objecting, non-participating physicians are limited because the term "participate" is defined to exclude actions that facilitate assisted suicide. *Id.* at 9. Defendants counter that the Act is facially neutral because no language in the text of the statute refers to religion and the statute does not operate in a manner that targets religious conduct. State Officer Defendants' Opp'n 12; MBC Opp'n 12.

The court agrees with Defendants. The plain language of the Act includes requirements that apply to all non-participating providers, regardless of the reasons the provider chooses not to participate. There is nothing in the text of the statute that references or targets religious conduct. Thus, the statute is facially neutral.

Plaintiffs argue that even if the Act is facially neutral, it is impermissibly gerrymandered against religious individuals, including CMDA members. Mot. 9. Plaintiffs, however, do not explain how the Act operates in a discriminatory manner other than to argue that those who participate in the Act are protected from certain disciplinary actions, while non-participating providers are subject to liability.

To begin, the plain language of the statute is clear that both participating and nonparticipating providers receive protection regardless of their decision of whether or not to participate. Section 443.14(e)(3) explicitly states: "[a] health care provider or health care entity is <u>not subject</u> to civil, criminal, administrative, disciplinary, employment, credentialing, professional discipline, contractual liability, or medical staff action, sanction, or penalty or other liability <u>for refusing to participate</u>." Cal. Health & Safety Code § 443.14(e)(3) (emphasis added). This corresponds exactly with the protections provided to physicians who elect to participate. *See* Section 443.14(c) ("a health care provider or a health care entity shall not be subject to civil, criminal, administrative, disciplinary, employment, credentialing, professional discipline, contractual liability, or medical staff action, sanction, or penalty or other liability for participating in this part."). Section 443.14(b) applies to both participating and nonparticipating providers. *See* Cal. Health & Safety Code § 443.14(c) ("A health care provider, health care entity, or professional organization or association shall not subject an individual to censure, discipline, suspension, loss of license, loss of privileges, loss of membership, or other penalty <u>for participating in good faith compliance with this part or for refusing to participate in accordance with subdivision (e)</u>.") Accordingly, Plaintiffs fail to demonstrate that the Act operates in manner targeted toward religion.

A law that, "in a selective manner impose[s] burdens only on conduct motivated by religious belief" is not generally applicable. *Id.* at 543. This includes a law that is substantially underinclusive. *Id.* For example, a law that targets conduct based on religious belief, "but fails to include in its prohibitions substantial, comparable secular

15

conduct that would similarly threaten the government's interest" is not generally
applicable.  *Parents for Priv. v. Barr*, 949 F.3d 1210, 1235 (9th Cir. 2020), *cert.
denied*, 141 S. Ct. 894 (2020).  Here, the mandates in Section 443.14(e) apply to all
non-participating providers and are not substantially underinclusive.  Because the
statute is neutral and generally applicable, strict scrutiny does not apply.

Plaintiffs next argue that even if the Act is neutral and generally applicable, it
still violates values rooted in the religion clauses and, thus, is subject to strict scrutiny.
Mot. 12-15; Dkt. 61 ("Reply to MBC Opp'n") at 12-13.  However, "[t]he
government's ability to enforce generally applicable" laws "cannot depend on
measuring the effects of a governmental action on a religious objector's spiritual
development."  *Smith*, 494 U.S. at 885.  None of Plaintiffs' cited authority supports a
finding that *Smith* does not apply and that the Act, which is neutral and generally
applicable, should be subject to strict scrutiny on this basis.[10]  *Thomas*, which was
decided prior to *Smith*, applied the *Sherbert* test, which held that "governmental
actions that substantially burden a religious practice must be justified by a compelling
governmental interest."  *Smith*, 494 U.S. at 883 (citing *Sherbert v. Verner*, 374 U.S.
398 (1963)).  *Smith* did not overturn *Thomas*, but confined the decision, noting that
the Court's "decisions in the unemployment cases stand for the proposition that where
the State has in place a system of individual exemptions, it may not refuse to extend
that system to cases of 'religious hardship' without compelling reason."  *Smith*, 494
U.S. at 884.  Here, the Act does not provide for a system of "individual exemptions";
thus, *Thomas* does not apply.

---

[10] Plaintiffs suggest the court should not follow *Smith* because it "distorts a proper
understanding of the Free Exercise Clause."  Mot. 12 n. 3.  However, the Supreme
Court has had numerous opportunities to reconsider the standards articulated in *Smith*
and has declined to do so, including in *Fulton*, 141 S. Ct. at 1881.  Most recently, in
*Kennedy*, 142 S. Ct. at 2421-22, the Court again affirmed that a law that is neutral and
generally applicable is not subject to strict scrutiny.

1    Further, the additional cases Plaintiffs rely on are inapposite.  The ministerial

2  exception recognized in *Hosanna-Tabor Evangelical Lutheran Church & School v.*

3  *E.E.O.C.*, 565 U.S. 171, 196 (2012), which involved "an employment discrimination

4  suit brought on behalf of a minister, challenging her church's decision to fire her," is

5  inapplicable here.  *Hosanna-Tabor*, *id.* at 173, "concern[ed] government interference

6  with an internal church decision that affect[ed] the faith and mission of the church

7  itself."  Unlike *Hosanna-Tabor*, the present action does not involve matters of a

8  church or its ministers.  *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 137 S.

9  Ct. 2012, 2021 (2017), another action brought by a church, involved a policy that

10  "expressly discriminate[d] against otherwise eligible recipients by disqualifying them

11  from a public benefit solely because of their religious character."  Similarly,

12  *Masterpiece Cakeshop, Ltd. v. Colorado Civil Rights Commission*, 138 S. Ct. 1719,

13  1732-33 (2018), involved "official expressions of hostility to religion" that were

14  "inconsistent with the First Amendment's guarantee that our laws be applied in a

15  manner that is neutral toward religion."  Unlike *Trinity Lutheran or Masterpiece*

16  *Cakeshop*, here, there is no evidence of express discrimination or hostility based on

17  religion.

18    The court recognizes that Plaintiffs have sincerely held religious beliefs, and

19  that compliance with the documentation requirements contained in Section

20  443.14(e)(2) infringes on the free exercise of their religion.  However, under clearly

21  established doctrine in *Smith*, *Lukumi*, and *Fulton*, strict scrutiny does not apply to a

22  neutral and generally applicable law, like the Act here.  "[A] law that is neutral and of

23  general applicability need not be justified by a compelling governmental interest even

24  if the law has the incidental effect of burdening a particular religious practice."

25  *Lukumi*, 508 U.S. at 531.  Thus, the court applies rational basis review, "which means

26  that the [Act] must be upheld if it is rationally related to a legitimate governmental

27  purpose."  *Barr*, 949 F.3d at 1238.

28

Defendants contend that "[o]ne of the primary purposes of SB 380's amendments to the Act was to address delays in the process for obtaining aid-in-dying medication." State Officer Defendants' Opp'n 14; MBC Opp'n 14-15. The court agrees that the requirements in Section 443.14(e)(2) are rationally related to this legitimate purpose. Plaintiffs fail to "negate every conceivable basis" for the amendments contained in SB 380. *Barr*, 949 F.3d at 1238. Accordingly, Plaintiffs fail to establish they are likely to succeed on the merits of their Free Exercise claim.[11]

### 2. Free Speech

"The First Amendment, applicable to the States through the Fourteenth Amendment, prohibits laws that abridge the freedom of speech." *Nat'l Inst. of Fam. & Life Advocs. v. Becerra* (*NIFLA*), 138 S. Ct. 2361, 2371 (2018). When enforcing this prohibition, the court distinguishes between content-based and content-neutral regulations of speech. *Id.* "Content-based regulations target speech based on its communicative content" and "are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." *Id.* (citations and quotations omitted). A regulation that "compel[s] individuals to speak a particular message" is content-based and subject to strict scrutiny. *Id.* "Government discrimination among viewpoints—or the regulation of speech based on 'the specific motivating ideology or the opinion or perspective of the speaker'—is a 'more blatant' and 'egregious form of content discrimination.'" *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 168 (2015). Content-neutral speech is subject to a lower standard of review and must "promote[] a substantial government interest

---

[11] Plaintiffs argue in a footnote in their Motion that the "hybrid rights" exception should apply in this case. Mot. 14, n. 4. However, "[t]here is … no binding Ninth Circuit authority deciding the issue of whether the hybrid rights exception exists and requires strict scrutiny." *Barr*, 949 F.3d at 1237. Moreover, Plaintiffs provide no authority for how the hybrid rights exception, if it does exist in this circuit, applies here.

1   that would be achieved less effectively absent the regulation." *Ward v. Rock Against*
2   *Racism*, 491 U.S. 781, 798-99 (1989).

3   "[T]he First Amendment does not prevent restrictions directed at commerce or
4   conduct from imposing incidental burdens on speech." *Sorrell v. IMS Health Inc.*,
5   564 U.S. 552, 567 (2011). Although the Supreme Court has recognized that
6   "professional speech" is not a separate category of speech subject to a lower level of
7   protection, it has "afforded less protection for professional speech in two
8   circumstances." *NIFLA*, 138 S. Ct. at 2371-72. First, the Court "ha[s] applied more
9   deferential review to some laws that require professionals to disclose factual,
10  noncontroversial information in their 'commercial speech.'" *Id.* Second, "States may
11  regulate professional conduct, even though that conduct incidentally involves speech."
12  *Id.*

13  Plaintiffs argue the documentation requirement contained in Section
14  443.14(e)(2) is impermissible compelled speech, subjecting the Act to strict scrutiny.
15  Mot. 19. Further, Plaintiffs contend that physicians who fail to document requests for
16  aid-in-dying drugs are at risk of civil, criminal, and regulatory liability, and, thus, face
17  viewpoint discrimination. *Id.* Defendants counter that the Act's requirements that
18  non-participating providers document an individual's request for aid-in-dying drugs in
19  the patient's medical record constitutes regulation of professional conduct, which is
20  subject to a lower level of scrutiny and permissible under the First Amendment as
21  recognized in *NIFLA*, 138 S. Ct. at 2372. State Officer Defendants' Opp'n 16; MBC
22  Opp'n 17.

23  The professional conduct exception has been applied traditionally to informed
24  consent requirements. The requirement that a doctor provide information to a patient
25  as part of informed consent has not infringed on the First Amendment right to
26  freedom of speech because speech is implicated "only as part of the *practice* of
27  medicine, subject to reasonable licensing and regulation by the State." *NIFLA*, 138 S.
28  Ct. at 2373 (citing *Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833, 884 (1992),

1    *overruled by Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228, 2242

2    (2022)).[12]

3         In contrast, the Supreme Court in *NIFLA* held that a California law that required

4    licensed pregnancy-related clinics to disseminate a government-drafted notice

5    regarding the availability of publicly-funded family-planning services did not regulate

6    professional conduct, but rather was content-based regulation of speech.  *NIFLA*, 138

7    S. Ct. at 2373.  The notice at issue required licensed clinics to "provide a government-

8    drafted script about the availability of state-sponsored services," which included

9    abortion, "as well as contact information for how to obtain them."  *Id.* at 2371.

10   Petitioners were required to disseminate this information, even though they opposed

11   abortion.  *Id.*  Further, unlike with informed consent, the notice "applie[d] to all

12   interactions between a covered facility and its clients, regardless of whether a medical

13   procedure [was] ever sought, offered, or performed."  *Id.*  Because the requirement

14   "compel[ed] individuals to speak a particular message," strict scrutiny applied.  *Id.*

15   (citation omitted).

16        Like in *NIFLA*, the documentation requirement imposed by the Act "plainly

17   alters the content" of non-participating health care providers' speech.  *See id.* at 2371

18   (citation omitted).  Non-participating providers, who oppose assisted suicide, are

19   required to make a notation in an individual's medical record "document[ing] the

20   individual's date of request and provider's notice to the individual of their objection."

21   Cal. Health & Safety Code § 443.14.  This documentation can then be used to satisfy

22   one of the two oral requests required to obtain aid-in-dying medication.  *Id.* § 443.3.

23   The ultimate outcome of this requirement is that non-participating providers are

---

[12] The Supreme Court in *Dobbs*, 142 S. Ct. at 2242, held unequivocally that "*Casey* must be overruled."  The Supreme Court has not ruled to what extent, if any, the exception for the regulation of professional conduct survives.

compelled to participate in the Act through this documentation requirement, despite
their objections to assisted suicide.

Furthermore, in *NIFLA*, 138 S. Ct. at 2374, the Supreme Court expressed
concern over "the danger of content-based regulations 'in the fields of medicine and
public health, where information can save lives.'" "Doctors help patients make deeply
personal decisions, and their candor is crucial." *Id.* As the Supreme Court
recognized, "[p]rofessionals might have a host of good-faith disagreements, both with
each other and with the government," including disagreements "about the ethics of
assisted suicide." *Id.* at 2374-75. Here, the documentation requirement imposed by
the Act interferes with the ability of these health care professionals to have those
disagreements, and "the people lose when the government is the one deciding which
ideas should prevail." *Id.* at 2375. A content-based regulation, such as this one, is
"presumptively unconstitutional and may be justified only if the government proves
that [it is] narrowly tailored to serve compelling state interests." *Id.* at 2371.
Accordingly, the court applies strict scrutiny to the documentation requirements
contained in Section 443.14(e)(2).

Defendants argue "California has a substantial interest in ensuring that
terminally ill patients are not obstructed or delayed in their efforts to obtain aid-in-
dying medication." State Officer Defendants' Opp'n 20; MBC Opp'n 20. The
"'right' to assistance in committing suicide is not a fundamental liberty interest
protected by the Due Process Clause." *Washington v. Glucksberg*, 521 U.S. 702, 728
(1997). Over the years, "[t]hroughout the Nation, Americans [have] engaged in an
earnest and profound debate about the morality, legality, and practicality of physician-
assisted suicide." *Id.* at 735.

In enacting the California End of Life Option Act, the State of California has
decided to provide a statutory right to assisted suicide under certain circumstances.
Accordingly, the state has an interest in ensuring individuals are able to take part in
the Act. However, Defendants fail to explain how the requirements in Section

21

443.14(e)(2) are narrowly tailored to serve such an interest. The Act requires an individual to submit two oral requests for aid-in-dying medication 48 hours apart. Cal. Health & Safety Code § 443.3. Because an individual seeking aid-in-dying medication will ultimately be required to visit a participating physician to obtain a prescription for the aid-in-dying medication, the documentation requirement appears, at most, to streamline the process by 48 hours for patients who initially visit a non-participating provider. Defendants have not demonstrated or even alleged this is a frequent occurrence, or that a delay of such a duration would commonly interfere with an individual's ability to participate in the Act.

Defendants further argue they have an interest in the appropriate management of medical records—which is an interest that would be achieved less effectively absent the regulation. *See Ward*, 491 U.S. at 799. For example, the American Medical Association ("AMA") Code of Medical Ethics instructs that "physicians have an ethical obligation to manage medical records appropriately." Dkt. 54-7 (Code of Medical Ethics Opinion 3.3.1) at 2. This includes retaining "[r]ecords of significant health events or conditions and interventions that could be expected to have a bearing on the patient's future health care needs" and "mak[ing] the medical record available … [a]s requested or authorized by the patient" and "[a]s otherwise required by law." *Id.* However, the documentation requirement contained in the Act exceeds merely managing medical records—it imposes an affirmative documentation requirement.

Accordingly, the court finds that the requirements of Section 443.14(e)(2) are not narrowly tailored to serve a compelling state interest. Plaintiffs, therefore, establish they are likely to succeed on their Free Speech claim.

### 3. Due Process

"It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). "A statute can be impermissibly vague for either of two independent reasons": (1) "if it fails to provide people of ordinary intelligence a reasonable

opportunity to understand what conduct it prohibits," or (2) "if it authorizes or even encourages arbitrary and discriminatory enforcement." *Hill v. Colorado*, 530 U.S. 703, 732 (2000) (citing *City of Chicago v. Morales*, 527 U.S. 41, 56 (1999)). "[S]peculation about possible vagueness in hypothetical situations not before the Court will not support a facial attack on a statute when it is surely valid 'in the vast majority of its intended applications.'" *Hill*, 530 U.S. at 733.

Plaintiffs contend the terms "terminal disease," "providing information," and "participation" are unconstitutionally vague and ambiguous such that no reasonable health care provider could understand the meaning of those terms. Mot. 20-21. Defendants argue Plaintiffs' challenge to these terms is based on Plaintiffs' flawed interpretation of the statute, in viewing the exclusions of section 443.15(f)(3) as required acts. State Officer Defendants' Opp'n 18; MBC Opp'n 18-19. The court will address the parties' arguments regarding each phrase in turn.

First, Plaintiffs challenge the phrase "terminal disease," which is defined in Section 443.1(r) to mean "an incurable and irreversible disease that has been medically confirmed and will, within reasonable medical judgment, result in death within six months." Mot. 21. According to Plaintiffs, no reasonable health care professional in Plaintiffs' position could know whether it means a disease that will "result in death within six months with treatment or without treatment." *Id.* The court disagrees.

Section 443.1(r) defines a "terminal disease" as an "incurable and irreversible disease that has been medically confirmed…." Only "an adult with the capacity to make medical decisions and with a terminal disease may make a request to receive a prescription for an aid-in-dying drug" if the requirements of the Act are satisfied. Cal. Health & Safety Code § 443.2(a). Pursuant to Section 443.1(e) and (j), an individual must have "the ability to make and communicate an informed decision to health care providers," which must be "based on an understanding and acknowledgement of the relevant facts," including "[t]he feasible alternatives or additional treatment

23

opportunities…." *Id.* § 443.1(e), (j). Accordingly, the court finds that a reasonable medical provider would understand the term "terminal disease" to mean that the disease will result, "within reasonable medical judgment," in the qualified individual's death within six months, based on the individual's informed medical decisions regarding his or her treatment. This term is not unconstitutionally vague, as used in the Act.

Second, Plaintiffs challenge the phrase "[p]roviding information to a patient about this part," which appears in Section 443.15(f)(3)(B), on the grounds that "[i]t is unclear how much and what type of information a physician must provide to patients." Mot. 21. As stated, Section 443.15(f)(3) does not impose affirmative requirements for non-participating providers. This argument, thus, fails.

Third, Plaintiffs challenge the term "participation," on the grounds that no reasonable health care professional in Plaintiffs' position could know what the term does and does not include. Mot. 21-22. According to Plaintiffs, it is unclear whether the definition of "participating" in Section 443.15(f)(2) includes the conduct stated in (f)(3). Mot. 21. The court disagrees. The plain language of the Act clearly identifies what is included under the definition of "participating" in Section 443.15(f)(2), and what is not included in Section 443.15(f)(3). A reasonable health care provider reading this section would not understand the term "participating" to include the conduct identified in subdivision (f)(3), given that subdivision clearly states that such conduct is not included in the definition. Plaintiffs' third argument, thus, fails.

When "read as a whole," the Act provides a reasonable physician of ordinary intelligence a reasonable opportunity to know what is required under Section 443.14 and what conduct is prohibited. *See Schenck v. Pro-Choice Network of W. N.Y.*, 519 U.S. 357, 383 (1997). Accordingly, Plaintiffs fail to establish they are likely to succeed on their Due Process claim.

/ / /

/ / /

### 4. Equal Protection

"The Equal Protection Clause of the Fourteenth Amendment commands that no State shall 'deny to any person within its jurisdiction the equal protection of the laws,' which is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985). Courts "treat[] as presumptively invidious those classifications that disadvantage a 'suspect class,' or that impinge upon the exercise of a 'fundamental right.'" *Plyler v. Doe*, 457 U.S. 202, 216-17 (1982). A statute that "classifies by race, alienage, or national origin" is subject to strict scrutiny and "will be sustained only if [it is] suitably tailored to serve a compelling state interest." *City of Cleburne*, 473 U.S. at 440. However, "where individuals in the group affected by a law have distinguishing characteristics relevant to interests the State has the authority to implement … the Equal Protection Clause requires only a rational means to serve a legitimate end." *Id.* at 441-42.

Plaintiffs argue SB 380 violates the Equal Protection Clause because it provides greater protections for participating physicians than non-participating physicians. Mot. 22-23. Essentially, Plaintiffs contend that health care providers who choose not to participate in the Act belong to a class that is unconstitutionally treated differently from those who choose to participate. But "non-participating physicians" do not belong to a suspect class, and, thus, the statute is not subject to strict scrutiny review. Therefore, the statute is "presumed to be valid and will be sustained if the classification drawn by the statute is rationally related to a legitimate state interest." *City of Cleburne*, 473 U.S. at 440. The requirements imposed by Section 443.14(e)(2), (4), and (5) on non-participating physicians are rationally related to the State of California's legitimate interest in regulating the management and transfer of a patient's medical records. *See* Dkt. 54-7 at 2. Thus, Plaintiffs fail to establish they are likely to succeed on their Equal Protection claim.

/ / /

/ / /

**D.    Conclusion**

Having found Plaintiffs are likely to succeed on the merits of their First Amendment free speech claim, the *Winter* factors favor a preliminary injunction. Plaintiffs have demonstrated they are likely to suffer a violation of a constitutional right absent an injunction, and "[i]t is well established that the deprivation of constitutional rights 'unquestionably constitutes irreparable injury.'" *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012). Furthermore, "it is always in the public interest to prevent the violation of a party's constitutional rights." *Id.* (citation omitted).

<u>**CONCLUSION**</u>

For the foregoing reasons, the court GRANTS in part Plaintiffs' Motion for Preliminary Injunction and orders as follows: Defendants are enjoined from enforcing the provision of Cal. Health & Safety Code § 443.14(e)(2) which requires a health care provider who is unable or unwilling to participate to "document the individual's date of request and provider's notice to the individual of their objection in the medical record[.]"

IT IS SO ORDERED.

Dated: September 2, 2022

_____
FERNANDO L. AENLLE-ROCHA
United States District Judge