## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

**MARK LACY M.D.,** *et al.,*

  **Plaintiffs,**

v.                                        **Case No. 1:22-cv-00953-MIS-KK**

**RAÚL TORREZ, in his official
capacity as Attorney General of the
State of New Mexico,** *et al.,*

  **Defendants.**

### DEFENDANT ATTORNEY GENERAL TORREZ'S MOTION TO DISMISS

Defendant Attorney General Raúl Torrez respectfully moves the Court to dismiss all claims against him. Plaintiffs lack Article III standing to bring these claims, and even if the complaint could pass Article III muster, it should be dismissed for failing to state a claim. Opposing counsel was contacted and opposes this motion.

## I.   INTRODUCTION

### A.  GOVERNING STANDARDS

Under Rule 12(b)(1), courts must dismiss when they lack subject-matter jurisdiction, including when plaintiffs lack standing. *See Laufer v. Looper*, 22 F.4th 871, 875–77 (10th Cir. 2022). Under Rule 12(b)(6), courts must dismiss any claim that fails to state a plausible entitlement to relief. To state a plausible claim, complaints must allege enough facts to show that a particular plaintiff is entitled to relief from a given defendant. *See* Fed. R. Civ. P. 8(a); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). In *Kansas Penn Gaming, LLC v. Collins*, 656 F.3d 1210 (2011), the Tenth Circuit identified the two "working principles" underlying this standard. *See also Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009). First, courts ignore any legal conclusions, labels, and formulaic recitations of elements. *Kan. Penn*, 656 F.3d at 1214. Second, courts evaluate any remaining material to see whether plaintiffs' fact allegations "raise a right to relief above the speculative level." *Id.* (quoting *Twombly*, 550 U.S. at 555).

### B. Fact Allegations

For purposes of this motion, the operative facts are taken from Plaintiffs' Verified Complaint [Doc. No. 1], and are assumed to be true. Plaintiffs are Dr. Mark Lacy, a New Mexico physician, and the Christian Medical and Dental Association ("CMDA"), a national organization of Christian health care providers. Together, they challenge the constitutionality of several provisions and definitions within New Mexico's End-of-Life Options Act, NMSA 1978, §§ 24-7C-1 to -8 (2021).

For purposes of these claims, there are three provisions of particular concern. The first is a requirement to inform certain patients of care options:

> A health care provider shall inform a terminally ill patient of all reasonable options related to the patient's care that are legally available to terminally ill patients that meet the medical standards of care for end-of-life care.

Section 24-7C-6 (the "Requirement to Inform"). The second is a requirement to refer certain patients whom providers are unwilling to serve:

> No health care provider who objects for reasons of conscience to participating in the provision of medical aid in dying shall be required to participate in the provision of medical aid in dying under any circumstance. If a health care provider is unable or unwilling to carry out an individual's request pursuant to the End-of-Life Options Act, that health care provider shall so inform the individual and refer the individual to a health care provider who is able and willing to carry out the individual's request or to another individual or entity to assist the requesting individual in seeking medical aid in dying. If the health care provider transfers the individual's care to a new health care provider, the prior health care provider shall transfer, upon request, a copy of the individual's relevant medical records to the new health care provider.

Section 24-7C-7(C) (the "Requirement to Refer"). The third is a prohibition on retaliatory action against a physician for their participation or refusal to participate under the Act:

> A . . . professional organization or association . . . shall not subject a person to censure, discipline, suspension, loss or denial of . . . privileges of membership or other penalty for participating, or refusing to participate, in the provision of medical aid in dying in good faith compliance with the provisions of [the Act].

Section 24-7C-7(B) (the "Membership Requirement").

Dr. Lacy alleges that since the enactment of these provisions, he has not complied with them. He further alleges that he has no intention of complying, now or in the future. Compl. at ¶¶ 38, 40, 44. Neither has CMDA changed any of its membership or other practices in the nearly two years since the Act became law. *See* Compl. at ¶¶ 31–32. Despite this, Dr. Lacy and CMDA have not faced any enforcement or threat of enforcement under the Act. Nonetheless, they have sued Attorney General Raúl Torrez, the State's Department of Health, and members of the State's Board of Medicine—each in their official capacities—to seek prospective injunctive relief against any enforcement.[1]

## II.   ARGUMENT AND AUTHORITIES

The complaint is based on hypothetical enforcement that has not occurred, improbable interpretations that have not been applied, and rights that Plaintiffs have continued to exercise without repercussion since the Act became law. There is no live controversy, and this suit should be dismissed.

### A.   THE COMPLAINT PRESENTS NO JUSTICIABLE CONTROVERSY.

#### 1.   Plaintiffs Lack Standing to Proceed.

"A party that cannot present a case or controversy within the meaning of Article III does not have standing to sue in federal court." *Hobby Lobby Stores, Inc. v. Sebelius*, 723 F.3d 1114, 1126 (10th Cir. 2013), *aff'd sub nom.*, *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682 (2014). Courts analyze standing on a claim-by-claim and plaintiff-by-plaintiff basis. *See Bronson v. Swensen*, 500 F.3d 1099, 1106 (10th Cir. 2007). It is Plaintiffs' burden to establish three "irreducible constitutional minimum[s]" of standing: (i) an injury in fact, (ii) that is fairly traceable to a defendant's conduct, and (iii) is "likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). Injuries in fact are the "invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992).

---

[1] The Attorney General would be immune under the Eleventh Amendment from any other type of relief. U.S. Const. amend. XI; *Edelman v. Jordan*, 415 U.S. 651, 662–63 (1974); *Wagoner Cnty. Rural Water Dist. No. 2 v. Grand River Dam Auth.*, 577 F.3d 1255, 1258 (10th Cir. 2009).

In First Amendment cases such as this, in which plaintiffs have experienced no repercussions—much less specific enforcement—for their allegedly protected conduct, courts have permitted a law's "chilling effect" to substitute for immediate injury. *Initiative & Referendum Inst. v. Walker*, 450 F.3d 1082, 1088–89 (10th Cir. 2006). But this chilling effect must itself be more than mere hypothesis or conjecture. Plaintiffs claiming a chilling effect "can satisfy the requirement that . . . injury be 'concrete and particularized' by (1) evidence that in the past they have engaged in the type of speech affected . . . ; (2) affidavits or testimony stating a present desire, though no specific plans, to engage in such speech; and (3) a plausible claim that they presently have no intention to do so because of a credible threat [of enforcement]." *Walker*, 450 F.3d at 1089; *see Brown v. Herbert*, 850 F. Supp. 2d 1240, 1247–48 (D. Utah 2012) (asking "whether a reasonable person would view the threat of prosecution sufficiently likely that he or she would be deterred from engaging in the prohibited conduct").

### a. *CMDA*

CMDA does not allege any direct patient care or any theory of capacity to sue on behalf of its members. It therefore has no standing for Counts I–IV, which relate only to provider conduct.

Regarding Count V, CMDA does not allege that it has changed any of its policies in response to the Act, that it has refrained from speaking when it wants, or that it has faced any enforcement as a result. Thus, its allegations show no injury and point to no chilling effect at all. *See Spokeo*, 578 U.S. at 338 ("Where, as here, a case is at the pleading stage, the plaintiff must clearly allege facts demonstrating each element." (internal quotation marks and citation omitted)). The Court should find that CMDA lacks standing to proceed.

### b. *Dr. Lacy*

Count V of the complaint makes no allegations on behalf of Dr. Lacy; he has no standing to pursue this count. Regarding Counts I–IV, Dr. Lacy does not allege that he has faced any enforcement. Neither does he allege that his speech has been chilled. In fact, he alleges that in the nearly two years

since the Act took effect, he has not changed any of his practices and that he does not *intend* to do so. Compl. at ¶¶ 40, 96, 98. Consequently, Dr. Lacy has not alleged an injury and instead calls upon the Court to be a "free-wheeling enforcer" of his preferred statutory scheme. *Walker*, 450 F.3d at 1087.

The Court should decline this invitation. Article III standing directly enforces the constitutional prerequisite that a plaintiff present a live "case or controversy" to "maintain a lawsuit in federal court." *Spokeo*, 578 U.S. at 337–38; *see also Walker*, 450 F.3d at 1087 ("[W]e cannot reach the merits based on 'hypothetical standing,' any more than we can exercise hypothetical subject matter jurisdiction."). Article III standing ensures that courts are presented with true stakeholders and well-developed facts so that they can issue clear legal rules without encroaching on the legislative territory of prospective policy-making. *Cf. Spokeo*, 578 U.S. at 337; *Steel Co. v. Citizens for a Better Environ.*, 523 U.S. 83, 94 (1998). All causes of action in this case should, therefore, be dismissed.

### 2. Plaintiffs' Facial Challenges Are Disfavored.

Plaintiffs have not alleged that the Act, as applied to them, has resulted in any injury or chill. Neither should they be permitted to proceed on any facial challenge to the Act.

As a general rule, "constitutional rights are personal and may not be asserted vicariously." *Broaderick v. Oklahoma*, 413 U.S. 601, 610–11 (1973) ("[C]ourts are not roving commissions assigned to pass judgment on the validity of the Nation's laws."). There is an exception for First Amendment issues, but only for viable claims of overbreadth. In other words, standing is relaxed for a plaintiff mounting facial "attacks on overly broad statutes" that regulate speech, even where the law has not unconstitutionally limited the particular plaintiff's speech. *Id.* at 610–12 (1973); *see also Ams. for Prosperity Found. v. Bonta*, 141 S. Ct. 2373, 2387 (2021) (clarifying that this exception allows an overbreadth challenge only where "a substantial number of [a law's] applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep"). But this case does not fit within the overbreadth

exception. In fact, the complaint alleges the inverse: that the law fairly and validly regulates everybody *except* for Dr. Lacy and persons situated similarly to him. *See* Part II.B *infra.*

Because no exception applies, Plaintiffs' facial challenges are, like any other facial challenge, "the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid." *United States v. Salerno*, 481 U.S. 739, 745 (1987); *see also Wash. State Grange v. Wash. State Repub. Party*, 552 U.S. 442, 450 (2008) ("Facial challenges are disfavored for several reasons."); *Sabri v. United States*, 541 U.S. 600, 608 (2004). Because Plaintiffs are unable "to shoulder their heavy burden to demonstrate that the Act is 'facially' unconstitutional," *Salerno*, 481 U.S. at 745; *see* Part II.B *infra*, the Court should limit its inquiry to whether the law has been unconstitutionally applied to Plaintiffs—an inquiry that Plaintiffs lack standing to demand.

> **B. THE COMPLAINT STATES NO COLORABLE CLAIMS.**
>
> **1. Count I States No Viable Claim of Compelled Speech.**

Count I asserts that the Act violates Dr. Lacy's First Amendment rights by compelling speech and by discriminating on the basis of speech content and viewpoint. Specifically, the complaint takes issues with the Act's Requirements to Inform and Refer certain patients.

> **a. *Intermediate scrutiny applies.***

Contrary to Dr. Lacy's assertion, strict scrutiny does not apply to Count I. As a general matter, the regulation of commercial speech is met with lesser scrutiny. *Florida Bar v. Went For It, Inc.*, 515 U.S. 618, 623 (1995) (describing intermediate scrutiny and recognizing that commercial speech receives only this "limited measure of protection" because "[w]e have always been careful to distinguish commercial speech from speech at the First Amendment's core"). In *National Institute of Family & Life Advocates v. Becerra*, 138 S. Ct. 2361, 2371–75 (2018) ("*NIFLA*"), the Court confirmed that "more deferential review" still applies to commercial speech and to the "regulat[ion of] professional conduct, even though that conduct incidentally involves speech." *Id.* at 2373. Even when professionals engage

in noncommercial speech, strict scrutiny will only apply to regulation that is content-based rather than content-neutral. Content-based laws are those prohibit speech based on "communicative content" or those that alter speech by "compelling individuals to speak a particular message." *Id.* at 2371; *see also Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 168 (2015). As a matter of law, the Act does neither.

First, the Act does not impermissibly compel speech. Speech is not compelled, within the meaning of constitutional freedoms, when professionals are required "to disclose factual, noncontroversial information in their 'commercial speech.'" *See NIFLA*, 138 S. Ct. at 2372. Nor do laws impermissibly infringe when they regulate professional conduct. *Id.* at 2372–73. Dr. Lacy may have strong feelings about the Act—and may even feel that the choice to legalize the option was controversial—but it is objectively true, and not subject to debate or argument, that New Mexico law permits medically assisted death. In other words, it is factually accurate, noncontroversial information that patients are entitled, under the law, to seek medical assistance in death. Requiring a physician to provide truthful and accurate information when asked is not an impermissible regulation of professional, commercial speech. *Cf. Milavetz, Gallop & Milavetz, P.A. v. United States*, 559 U.S. 229 (2010) (upholding requirement of certain factual information in attorney advertisements).

Moreover, unlike the offending regulation in *NIFLA*, the Act applies equally to all medical providers, yet does not require one universal message to all patients. *Compare* § 24-7C-6, *with NIFLA* 138 S. Ct. at 2372–74. Under the Act, physicians must exercise professional judgment to determine the set of options that are reasonable and meet the standard of care, and they may also share their individual opinions—or warnings—on these options. Far from requiring providers to "speak a certain message," the Act requires providers to give patients basic information while still allowing providers to append whatever "message" they choose to that factual information. Speech is not "compelled" by requiring physicians to inform patients about available, reasonable, and medically indicated options. *Cf. NIFLA* 138 S. Ct. at 2373 (reiterating constitutionality of informed consent requirements).

Neither is speech compelled through the Act's Requirement to Refer. Notably, this requirement is meaningfully distinct from the one recently examined in *CMDA v. Bonta*, Case No. 5:22-cv-335-FLA(GJSx) (Sept. 2, 2022) (Exhibit A to Pl.'s Mot. Prelim. Inj. [Doc No. 20-1] (the "PI Motion"). *Bonta* examined the following provision in California's medically assisted death statute:

> If a health care provider is unable or unwilling to participate under this part, … the provider shall, at a minimum, inform the individual that they do not participate in the End of Life Option Act, document the individual's date of request and provider's notice to the individual of their objection in the medical record, and transfer the individual's relevant medical record upon request.

Cal. Health & Safety Code § 443.14(e)(2) (2022). California's statute requires a patient to make two separate requests for medical aid in dying before they will be eligible for medication. *Id.* at § 443.3(a). Thus, in the context of the California statute, this seemingly benign provision held special significance. It made the referring physician's documentation of "the individual's date of request" a significant step that would "then be used to satisfy one of the two oral requests required to obtain aid-in-dying medication." *Bonta*, 5:22-cv-335-FLA(GJSx), ECF No. 108, at *20–21. This had the "ultimate outcome . . . that non-participating providers are compelled to participate" in the very process by which patients obtain their life-ending medication. *Id.* There is no parallel requirement in New Mexico's Act, and no similar concerns of compelled speech. *See id.* at *7 (CMDA's admission that "they do not object to [California's] requirements that a non-participating health care provider . . . transfer an individual's medical records upon request" and "would not object to the documentation requirement if it did not count as one of the two oral requests for a qualifying individual to obtain aid-in-dying drugs").

Second, the Act is content neutral. The Requirement to Inform ensures only that providers give accurate and complete information about treatment options that are reasonable, legal, *and* meet the standard of care. Section 24-7C-6; *see also* Part II.B.1.b.i *infra*.

Plaintiffs advance a contorted reading of this plain language, arguing that the provision "deems assisted suicide as meeting the 'medical standards of care.'" Compl. at ¶ 110. To the contrary, the

provision allows the Requirement to Inform to accommodate developing and evolving standards of care; it does not mandate what any standard of care will be. This plain language leaves to the local medical community any determination of what does and does not satisfy current standards of care. It is certainly conceivable that medically assisted death could now, or in the future, be the standard of care in particular circumstances. But the state has in no way required or endorsed that outcome by enacting a law that reserves to professionals the development of these standards. In addition, standards of care are just one component of the Requirement to Inform. Before a physician has an affirmative duty under this provision, medically assisted death must also be reasonable under the circumstances, which is a question of individual fact and of medical judgment. Thus, the provision once again functions narrowly to require only that providers give accurate information that is appropriate to the circumstances—not that they deliver one uniform and universal message on behalf of the state.

*If* required, this extremely limited factual information about the availability of care under the Act is then conveyed in the provider's own words and may be coupled with the provider's additional recommendations, opinions, and warnings. This is a far cry from the pre-written, "government-drafted script" on "how [women] can obtain state-subsidized abortions" that providers were mandated to give to all patients in *NIFLA*. 138 S. Ct. at 2369, 2371.

Consequently, the Act is not subject to strict scrutiny. Instead, it need only "promote[] a substantial government interest that would be achieved less effectively absent the regulation." *Ward v. Rock Against Racism*, 491 U.S. 781, 798–99 (1989); *see also Florida Bar*, 515 U.S. at 624 ("First, the government must assert a substantial interest in support of its regulation; second, the government must demonstrate that the restriction on commercial speech directly and materially advances that interest; and third, the regulation must be 'narrowly drawn.'").

### b. *The facts alleged do not give rise to a cognizable claim*

Applying this intermediate scrutiny, New Mexico has a substantial interest in those portions of the Act that Count I attacks. Specifically, Dr. Lacy takes issue with (i) the Requirement to Inform patients "of all reasonable options related to the patient's care that are legally available to terminally ill patients that meet the medical standards of care," § 24-7C-6, and (ii) the Requirement to Refer any patient who affirmatively requests medical assistance if he "is unable or unwilling to carry out [that request]," § 24-7C-7. There are several significant government interests at stake in these requirements.

First, New Mexico has a broad interest in regulating the health care profession. *Hill v. Colorado*, 530 U.S. 703, 715 (2000) ("It is a traditional exercise of the States' police powers to protect the health and safety of their citizens." (internal quotation marks and citation omitted)); *Semler v. Or. Bd. of Dental Examiners*, 394 U.S. 608, 612–13 (1935) (recognizing state's authority to regulate "the vital interest of public health"); *Buchwald v. Univ. of N.M. Sch. of Med.*, 159 F.3d 487, 498 (10th Cir. 1998) (concluding that "public health is a compelling government interest"); *see also Goldfarb v. Va. State Bar*, 421 U.S. 773, 792 (2004) ("We recognize that the States have a compelling interest in the practice of professions within their boundaries, and that as part of their power to protect the public health, safety, and other valid interests they have broad power to establish standards for . . . regulating the practice of professions."); *State ex rel. Whipple v. Martinson*, 256 U.S. 41, 45 (1921) ("The right to exercise this power [to regulate the prescription of habit-forming medication] is so manifest in the interest of the public health and welfare, that it is unnecessary to enter upon a discussion of it . . . ."). More specifically, New Mexico has an interest in ensuring that its health care providers engage in candid, accurate communication with patients. As the Supreme Court recognized in *NIFLA*, "Doctors help patients make deeply personal decisions, and their candor is crucial." 138 S. Ct. at 2374. Completeness and context are integral to honest, accurate communication, and New Mexico has an interest in making sure citizens are met with nothing less in their doctors' offices.

Second, New Mexico has an interest in preventing misinformation about its laws. Doctors occupy positions of extreme trust and speak with widely recognized authority. The State has an interest in making sure that the manner in which they respond to patient inquiries accurately represents the law and does not artificially restrict access to information or resources. *Cf. Goldfarb*, 421 U.S. at 792.

Third, New Mexico has an established interest in requiring informed consent. *See NIFLA*, 138 S. Ct. at 2373 (describing this requirement as "firmly entrenched" in the law). If providers withhold information about reasonable, available options that meet the prevailing standard of care, then any resulting consent to treatment is not fully informed.

Fourth, New Mexico has an interest in promoting access to medical services, including through timely, appropriate referrals. *See Buchwald*, 159 F.3d at 498 (describing the interest in "needed medical care to underserved areas" as "not only legitimate, but also compelling" and favorably citing precedent in support of the "State's interest in facilitating the health care of its citizens"); *cf. Hill*, 530 U.S. at 715 (recognizing legitimacy of a state's interest in "unimpeded access to health care facilities").

Fifth, New Mexico has an interest in promoting cooperative, positive relationships between patients and health care providers. There may be situations in which a provider's closely held beliefs conflict with a patient's permissible health care goals, and in those situations the State has an interest in supporting both the provider's beliefs and the patient's goals via an effective and accessible system of referrals. *Cf. Hill*, 530 U.S. at 715.

These state interests more than satisfy the "substantial interest" prong of intermediate scrutiny. That standard's second prong, that the interests would be "achieved less effectively without the regulation," is also satisfied.

Here, the complaint proves too much. Plaintiffs allege that absent these regulations (and, in some cases, *despite* these regulations) certain health care providers would decline to squarely answer patient questions about end-of-life options, would refuse to admit to patients that New Mexico law

permits medically assisted death, would obstruct patient attempts to change health care providers when desired, and would withhold from patients any information that the provider deems unsavory in his or her personal judgment. *See* Compl. at ¶¶ 40, 91, 94, 96–98, 119. Plaintiffs straightforwardly allege that, without these requirements, providers would provide less candor and less access to the patients they serve.

### c. *Even if strict scrutiny applied, dismissal would still be proper.*

Even if this Court finds that the Act is subject to strict scrutiny, its provisions would survive. Several of the above-listed state interests have already been recognized as sufficiently compelling for purposes of strict scrutiny. *See, e.g.*, *Buchwald*, 159 F.3d at 498 (identifying public health and health care access as compelling interests); *Goldfarb*, 421 U.S. at 792 (identifying state regulation of professional practices (law office) as a compelling interest). The Requirements to Inform and Refer are narrowly tailored to achieve these ends.

#### i.  *Requirement to Inform*

A plain-language reading the Act's Requirement to Inform reveals at least three qualifiers for the information a physician must provide. First, the options presented must consist of "all *reasonable* options"—not every conceivable, plausible, or even available option, but merely the options that are reasonable under the particular patient's circumstances. *See* § 24-7C-6. Second, the provider need not give any options that are not "legally available." *See id.* Third, the provider need only discuss options "that meet the medical standards of care for end-of-life care." *See id.* In other words, the options that must be presented are those that are reasonable under the individual circumstances, available as determined by applicable law, and standard of care according to the prevailing consensus of the medical community. It is almost difficult to conceive of a more tailored regulation than this one.

Plaintiffs insist that Section 24-7C-6 requires providers to state that medical aid in dying is always a reasonable medical option. Again, this appears nowhere in the text and cannot reasonably be

inferred from the plain language of the Act. If medical aid in dying is not reasonable or standard of care under a particular patient's circumstances, then no provider would be required to say otherwise.

Finally, even if Plaintiffs were correct that the Requirement to Inform is open to more than one interpretation, that only raises two further issues for Plaintiffs. First, it demonstrates why Plaintiffs' lack of standing is a critical issue. This Court ought not be asked to determine the constitutionality of purely hypothetical enforcements of purely speculative interpretations. *See* Part II.A *supra*; *see also Sabri*, 541 U.S. at 609. Second, it invokes this Court's obligation to interpret ambiguous statutes in favor of constitutionality. *Gonzales v. Carhart*, 550 U.S. 124, 153–54 (2007). In short, there is nothing constitutionally offensive about the Requirement to Inform.

### ii. *Requirement to Refer*

The Act's Requirement to Refer is even more limited than the Requirement to Inform, though its requirements are less discretionary. This makes sense, given that the Requirement to Refer is only triggered if and when a patient *affirmatively requests* medication that a provider is unwilling to prescribe. *See* § 24-7C-7(C). In other words, the Requirement to Refer is extremely limited—or narrowly tailored—to those situations where an adult patient has already taken the voluntary step of requesting a medical intervention to which they may be legally entitled.

Even then, providers need not assist in fulfilling the request for aid in dying. They need only respond with honest, factual information (that they are unwilling to carry out the request) and relinquish the relationship to another provider. Notably, the referral does not have to be directly to another health care provider known to be willing to carry out the request. That is just one option. The other option is to refer the patient "to another individual or entity to assist" in finding an appropriate provider. *Id.* Just as a lawyer must yield a client file when she can longer carry on a representation, a doctor whose practice and convictions are incompatible with a patient's lawful goals must cede control of that patient's health care. Such a requirement is constitutional under any level of scrutiny.

### 2. Count II States No Colorable Infringement On Free Exercise

Count II alleges that the same information and referral requirements also violate Plaintiffs' First Amendment free exercise rights, by treating providers who object to the Act on religious grounds less favorably than other providers.

### a. *Rational basis review applies*

Laws are not subject to strict scrutiny simply because they have "the incidental effect of burdening … religious practice." *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 531 (1993). Instead, laws that "incidentally" burden religion need only have a rational basis "so long as they are neutral and generally applicable." *Fulton v. City of Philadelphia*, 141 S. Ct. 1868, 1876 (2021). Laws are neutral toward religion unless they "proceed[] in a manner intolerant of religious beliefs or restrict[] practices *because* of their religious nature." *Fulton* 141 S. Ct. at 1877 (emphasis added); *Lukumi Babalu Aye*, 508 U.S. at 533 (explaining non-neutral laws have the "object" of "restrict[ing] practices because of their religious motivation"). Laws are "generally applicable" unless they "selective[ly] … impose burdens only on conduct motivated by religious belief." *Lukumi,* 508 U.S. at 543.

Because the Act is neutral and generally applicable, strict scrutiny does not apply. First, the Act is facially neutral toward religion. It makes no reference to religious practices and does not attempt to directly regulate religious exercise. Second, it is neutral in its application and effect because it does not infringe on or restrict conduct *because of* its religious motivation. Third, the Act is one of general applicability because it does not discern between religious and secular practices or burden religious objectors differently than nonreligious objectors. *See id.* at 533–34.

Plaintiffs themselves make numerous allegations about the several *secular* reasons that providers might object to providing medical assistance in dying—each of which the Act treats identically to religiously based objections. Plaintiffs allege in their Complaint that the Hippocratic Oath requires physicians to disavow assisted death, Compl. at ¶ 1; that the American Medical Association

considers medical assistance in death to be unethical because it exceeds a physician's role, is difficult to police, and presents societal risks, Compl. at ¶ 2; that a providers' proper role in assisting a terminally ill patient is "to provide comfort when healing is no longer possible," Compl. at ¶ 56; and that "life with dignity until natural death" is a "common goal" within the medical community, Compl. at ¶ 57. Plaintiffs have also argued, unequivocally, that medical assistance in death is contrary to "medical ethics," PI Motion at 6; that condemnations of medically assisted death have been "universal and historic," PI Motion at 7; that the Act sits in tension with "Plaintiffs' Religious *and Ethical* Beliefs," PI Motion at 8–9 (emphasis added); and that they "strenuously disagree that assisted suicide meets the relevant standards of care," PI Motion at 18. It is not necessary to adopt Plaintiffs' extreme characterizations in order to see their significance: Plaintiffs' own objections to the Act are not only religious but also secular. The Act treats equally all of Plaintiffs' objections—whether based on medical ethics, social policy, standards of care, secular beliefs about palliation and natural death, or religious faith. *See Tandon v. Newsom*, 141 S. Ct. 1294, 1296 (2021) (comparing neutral and generally applicable laws to those that "treat any comparable secular activity more favorably than religious exercise"). Consequently, it is neutral toward religion and generally applicable to all practices. Rational basis review applies.

### b.   *The facts alleged do not give rise to a cognizable claim.*

The Act's information and referral requirements survive intermediate scrutiny, *see* Section II.B.1.b *supra*, and even strict scrutiny, *see* Section II.B.1.c *supra*. Thus, they have a rational basis.

### c.   *Even if strict scrutiny applied, dismissal would still be proper.*

Plaintiffs attempt one more theory to invoke strict scrutiny: that the Act operates in a sphere of "hybrid rights," as described in *Employment Division Department of Human Resources of Oregon v. Smith*, 494 U.S. 872, 881 (1990). In that case, the Supreme Court held that state drug laws were constitutional even when applied to prohibit the sacramental use of peyote in religious ceremonies. *See id.* at 877–80

(abrogated in irrelevant part, as explained in *Holt v. Hobbs*, 574 U.S. 352, 356–58 (2015)). In reaching

this conclusion, the Court declined to read the Free Exercise Clause as broadly as Plaintiffs now seek:

> Respondents . . . seek to carry the meaning of "prohibiting the free exercise of
> religion" one large step further. They contend that their religious *motivation* for
> using peyote places them beyond the reach of a criminal law that is not
> specifically directed at their religious practice . . . . As a textual matter, we do
> not think the words must be given that meaning.

*Id.* at 878 (emphasis added). The Court then observed that it has considered religious motivations

rarely, and only when the challenge has involved some additional constitutional right, such as speech

or parental rights. *Id.* at 881.

These rare "hybrid" situations have still involved a measure of direct regulation that neither

*Smith* nor this case presents. *Id.* (collecting cases). The type of speech regulated in the "hybrid" type

cases was expressly religious speech, *i.e.*, street preaching, or proselytizing. *Follett v. McCormick*, 321

U.S. 573, 574–76 (1944); *Murdock v. Pennsylvania*, 319 U.S. 105, 108–10 (1943); *Cantwell v. Connecticut*,

310 U.S. 296, 301–05 (1940). The parental right recognized in *Wisconsin v. Yoder*, 406 U.S. 205 (1972),

was the right to raise children within the faith of a parent's choosing—no more and no less. *Yoder*,

which dealt with the compulsory public education of Amish children, presented a situation in which

raising children in the faith required strict adherence to an entire lifestyle and to literal separation from

surrounding culture. *Id.* at 216. On these facts, the Court determined that the challenged education

law would directly regulate and "gravely endanger if not destroy" free exercise. *Id.* at 218–19. But in

reaching this conclusion, the Court highlighted the unique situation and distinguished it from cases in

which religious communities might base claims merely on "their subjective evaluation and rejection

of the contemporary secular values accepted by the majority"—a type of claim that would "not rest

on a religious basis" within the meaning of the Free Exercise Clause. *Id.* at 216.

Plaintiffs' challenge to the Act is more like the hypothetical claim rejected in *Yoder* or the actual

claim rejected in *Smith*. The Act does not target religious exercise either directly or indirectly. Neither

does it treat religious *motivation* differently than secular motivation—it provides ample protections for conscientious objectors and does not treat religiously motivated objections any differently than secularly motivated ones.

In addition, the application of strict scrutiny based on hybrid-rights requires a "'colorable' showing' of infringement of [the] companion constitutional right." *Axson-Flynn v. Johnson*, 356 F.3d 1277, 1295, 1295–97 (10th Cir. 2004) (defining "colorable" as "a fair probability or likelihood, but not a certitude, of success on the merits"). As demonstrated in Section II.B.1, *supra*, and in Sections II.B.3– 5, *infra*, Plaintiffs cannot make any such showing. Thus, strict scrutiny does not apply to these claims. Even if it did, the Act would satisfy its requirements. As explained in detail above, Section II.B.1.c, the Act's Requirements to Inform and Refer narrowly serve several compelling state interests.

### 3.  Count III States No Infringement on Due Process.

In Count III, Plaintiffs allege that the Act violates their due process rights. This claim is limited to the allegation that certain terms within the Act are unconstitutionally vague and ambiguous, such that "no reasonable person in [Plaintiffs'] position could understand." Compl. at ¶¶ 138–39. Specifically, Plaintiffs take issue with four terms in the Act, each of which is sufficiently defined.

### a.  *Unreasonable interpretations will not render statutory provisions unconstitutionally vague.*

Statutes are not constitutionally void for vagueness unless their terms effectively prevent "ordinary people" from obtaining "fair notice of the conduct … proscribe[d]." *Sessions v. Dimaya*, 138 S. Ct. 1204, 1212 (2018). This analysis presumes "people of ordinary intelligence" and requires nothing more than a "reasonable opportunity to understand." *Dr. John's, Inc. v. City of Roy*, 465 F.3d 1150, 1158 (10th Cir. 2006). In other words, it does not entitle courts to nullify legislation based on interpretations that are improbably creative or intentionally obtuse. *Cf. Hill*, 530 U.S. at 732 ("[S]peculation about possible vagueness in hypothetical situations not before the Court will not support a facial attack on a statute when it is surely valid 'in the vast majority of its intended applications.'" (quoting *United States*

*v. Raines*, 362 U.S. 17, 23 (1960)). Instead, it requires courts to apply ordinary rules of interpretation to ask whether reasonable people, acting reasonably, could understand what a law requires.

### b. *The challenged terms are not void for vagueness.*

#### i. *Terminal Illness*

"Terminal illness" is the first of the Act's terms that Plaintiffs label vague and ambiguous. As defined in the Act, a terminal illness is a disease or condition that (i) is incurable, (ii) is irreversible, and (iii) will, within reasonable medical judgment, result in death within six months. Section 24-7C-2(J). Plaintiffs allege that "no reasonable health care professional" in their position could know what is or is not a terminal illness under this definition. *See* Compl. at ¶ 142.

Nothing about the term or its component parts is impermissibly confusing or vague. When given the opportunity to expand on their claim, Plaintiffs identified only these issues: nobody can know with total certainty whether a disease will cause death within six months, it is unclear whether this definitions "means *with* treatment or *without* treatment," doctors "have differing beliefs about end-of-life care," and sometimes medical judgments are wrong or conflicting. PI Motion at 24 (emphasis in original). None of these purported issues renders "terminal illness" a vague term.

First, the statute's plain language answers Plaintiffs' question about whether the definition contemplates treatment. To be terminal, an illness must be "incurable" and "irreversible"—meaning that the condition is anticipated to persist *even after* exhausting available treatment options. Second, "terminal illness," as defined in the Act, describes the *nature* of a diagnosis—not its statistical or actual accuracy. Plaintiffs' observation, that nobody knows the future and some prognoses will be proven wrong, does not introduce any confusion about the types of illnesses that are "terminal."

Plaintiffs do not argue that reasonable medical providers are incapable of making diagnoses, of determining which diagnoses lack cures, or of forming reasonable medical judgments about prognoses. Nor could they. They are constantly called on to do these very things. *Cf.* Compl. at ¶ 39.

In fact, Dr. Lacy swore under penalty of perjury that he "regularly sees terminally ill patients," that since the Act's passage he "has treated and advised dozens of terminally ill patients," and that he "has witnessed firsthand" the types of physical and emotional trials "that terminally ill patients can experience." Compl. at ¶¶ 39–43. He has also "personally received a request for medication from a terminally ill patient" under this very Act. Compl. at ¶ 44. Dr. Lacy was able to sign and verify these allegations without any qualification or apparent confusion because the Act is sufficiently clear to put Dr. Lacy (and all reasonable providers) on fair notice of what is meant by "terminal illness."

Neither is the Act's definition of "terminal illness" unreasonably vague simply because it relies on providers to form medical opinions and exercise medical judgment. Courts and practitioners alike frequently operate under just these sorts of standards. *See, e.g.*, NMSA 1978, § 12-2-4 (2007) (defining "death" to have occurred when there is an "irreversible cessation" of vital functions, as determined "in accordance with accepted medical standards"); NMSA 1978, § 24-8-4 (2015) (ensuring that providers can "refus[e] to provide any family planning service on the grounds that there are valid medical reasons for the refusal . . . based upon the judgment of a physician or [other practitioners]"); NMSA 1978, § 61-6-17(H) (2021) (permitting providers to delegate tasks "that a reasonable and prudent physician would find within the scope of sound medical judgment to delegate"); NMSA 1978, § 52-1-24.1 (1990) (defining maximum medical improvement as the time at which "further recovery from or lasting improvement to an injury can no longer be reasonably anticipated based upon reasonable medical probability"); NMSA 1978, § 31-21-25.1(F)(3) (1994) (considering "incurable condition[s] caused by illness or disease that would, within reasonable medical judgment, produce death within six months" for purposes of evaluating "terminally ill inmate[s]"); *see also State v. Downey*, 2008-NMSC-061, ¶ 36, 145 N.M. 232, 195 P.3d 1244 (holding expert medical testimony to a "reasonable certainty" standard). In short, the Act's incorporation of professional judgment does not create unconstitutional ambiguity. *See Voinovich v. Women's Med. Pro. Corp.*, 523 U.S. 1036 (1998)

(denying certiorari and distinguishing between a vague statute that asked whether a physician had "reason to believe" that a fetus "may be" viable, and a "clear" statute that required a doctor to determine medical necessity "in good faith and in the exercise of reasonable medical judgment").

ii.   *Participating*

Plaintiffs next take issue with the Act's use of the word "participate." More specifically, they allege that it is impossible for health care providers to "understand how one must 'participate' in assisted suicide and to what extent refusing to 'participate' is lawful." Compl. at ¶ 141; *see also* PI Motion at 24. This is a nonissue, because the Act does not use the term "participate" to impose either requirements or prohibitions. A review of the Act's actual language reveals that any affirmative requirement, and any proscribed conduct, is set out in clear language that does not use the word "participate" at all. §§ 24-7C-1 to -8. Instead, the word appears only as a shorthand descriptor of conduct that the Act separately defines, and it appears only in the section that provides immunities and protects "conscience-based decisions." § 24-7C-7. This usage, to neatly describe conduct that the Act has already defined, is not unclear and does not render the Act unconstitutionally vague.

A review of each use of the term confirms this conclusion. Section 24-7C-7 uses the word "participate" in six subsections. In the first two, subsection (A) and subsection (B), the word appears only in conjunction with "or refusing to participate" in order to cover *all* scenarios that could possibly exist. *See, e.g.*, § 24-7C-7(A) ("A person shall not be subject to . . . disciplinary action for: (1) participating, or refusing to participate, in medical aid in dying . . . ."). In other words, these two subsections protect all providers for any decision they make to provide or withhold medical assistance in death. No further definition is necessary.

The third provision, subsection (C), states that "[n]o health care provider who objects for reasons of conscience to participating *in the provision* of medical aid in dying shall be required to participate *in the provision* of medical aid in dying under any circumstance." § 24-7C-7(C) (emphasis

added). This language, which plainly states that physicians will not "under any circumstance" be forced to take part in *providing* medical assistance with death, is difficult to square with Plaintiffs' contention that they do not understand "to what extent refusing to 'participate' is lawful under the Act." Compl. at ¶ 141. Although Plaintiffs claim that the requirements to inform and refer certain patients effectively force them to participate in the provision of medical aid in dying, this only reveals the true nature of the dispute: Plaintiffs do not believe that the Act's protections against participation are unclear—they simply believe they are insufficient. *See, e.g.*, Compl. at ¶ 154 (reciting Plaintiffs' own allegation that the Act favorably treats "physicians who refuse *to participate* in assisted suicide *but* are willing to refer for and provide information about it"); *see also* Part II.B.1–2 *supra*. A substantive disagreement with the law is not the same as an inability to understand it.

The fourth and fifth uses of the word "participate," in subsection (E) and subsection (F), detail how health care entities may prohibit medical aid in dying and clarify the scope of their control over a provider not acting in the course and scope of her employment. § 24-7C-7(E)–(F). Once again, these provisions do not require or prohibit any conduct from Plaintiffs. Nor do Plaintiffs appear to take issue with these subsections. *See* Compl. At ¶ 141; PI Motion at 24.

The Act's sixth, and final, use of the word "participating" comes in Section 24-7C-7(H), which reads, "Participating in medical aid in dying shall not be the basis for a report of unprofessional conduct." This, again, does not require any action on behalf of the Plaintiffs or prohibit any of their desired conduct. *See* Compl. at ¶ 141; PI Motion at 24. It clarifies that participating in medically assisted death—as defined and described in other portions of the Act—is not a violation of New Mexico licensure rules. This clarification is natural and necessary because providing medical assistance with death was previously a crime in New Mexico. *See, e.g.*, Compl. ¶ 4. It is unnecessary to provide the same clarification for the *refusal* to participate because at no time has New Mexico law or licensing standards required physicians to provide medical aid in dying. *See, e.g.*, § 24-7C-7(C).

Because the use of the term "participate" is sufficiently clear, and because it is not used to impose any limitations on Plaintiffs, its use cannot possibly rob a citizen of the "reasonable opportunity to understand what conduct [the Act] prohibits." *Dr. John's*, 465 F.3d at 1158. It, therefore, presents no issues of unconstitutional vagueness.

### iii.  Section 24-7C-6

In an apparent admission that Section 24-7C-6 does not, in fact, deem medical assistance in death to be standard of care, Plaintiffs complain that this provision is unworkably vague because "[w]hether an option is 'reasonable' and 'related to the patient's care' depends on the medical expertise of the treating physician." *Compare* Compl. At ¶ 146 *and* PI Motion at 25, *with* Compl. at ¶ 106 *and* PI Motion at 11–12; *see also* Part II.B.1 *supra.* Once again Plaintiffs confuse the creation of a legal standard—which incorporates medical judgment, operates on reasonableness, and requires consideration of particular facts and circumstances—with creation of ambiguity. The void-for-vagueness doctrine is not a constitutional preference for bright-line rules. It is a minimum guarantee of notice and opportunity to comply. Section 24-7C-6 provides that, and nothing more is required. *See Hill*, 500 U.S. at 733 ("[W]hile there is little doubt that imagination can conjure up hypothetical cases in which the meaning of these terms will be in nice question, because we are condemned to the use of words, we can never expect mathematical certainty from our language." (internal quotation marks and citation omitted)). Plaintiffs' void-for-vagueness claims should be dismissed.[2]

### 4.  **Count IV States No Equal Protection Violation.**

In Count IV, Plaintiffs claim that the Act fails to provide equal protection under the law because it treats different types of behavior differently. This state of affairs, inherent in every law, does

---

[2] Plaintiffs' preliminary injunction motion asserts that the Act's good-faith compliance provision, found in Section 24-7C-7(A), is also vague. The Complaint does not, however, challenge this provision and provides no allegations to support a challenge. The new claim should not be considered. And even if Plaintiffs were allowed to add these allegations, they would fail. A "good faith" requirement in no way renders a law ambiguous. *Voinovich*, 523 U.S. at 1036 (denying certiorari). Neither does this provision permit "arbitrary and discriminatory enforcement," as Plaintiffs' motion concludes without argument, explanation, or support. PI Motion at 24–25.

not invoke heightened review and does not endanger Plaintiffs' fundamental rights. *Cf. Skinner v. Oklahoma*, 316 U.S. 535, 539–40 (1942) ("[T]he claim that state legislation violates the equal protection clause of the Fourteenth Amendment is the usual last resort of constitutional arguments. . . . [T]he States in determining the reach and scope of particular legislation need not provide abstract symmetry. They may mark and set apart the classes and types of problems according to the needs and as dictated or suggested by experience." (internal quotation marks and citation omitted)). Thus, legislation challenged on equal protection grounds "is presumed to be valid" and receives strict scrutiny only when it expressly classifies citizens according to a suspect category or when it "impinge[s] on personal rights protected by the Constitution." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 440 (1985).

### a.   *Rational basis review applies*

Plaintiffs contend that the Act violates the Fourteenth Amendment's guarantee of equal protection because it creates separate categories of physicians. First, it separates those "who are willing to facilitate . . . assisted suicide [from] similarly situated physicians who are not." Compl. at ¶ 153. Second, it distinguishes between those "who refuse to participate in assisted suicide but are willing to refer for and provide information about it, and similarly situated physicians who refuse to participate and are unwilling to refer for and provide information about it." Compl. at ¶ 154.

These are not suspect classifications. *See City of Cleburne*, 473 U.S. at 440. Thus, rational basis review applies. *Id.* at 441–42.

### b.   *The facts alleged do not give rise to a cognizable claim.*

It is not clear that the Act does, in fact, treat these groups of physicians differently, given the Act's broad protections for conscientious objectors and its direction that no person shall be subject to disciplinary action for either participating or refusing to participate in medically assisted death. Even if it does, these distinctions survive a rational basis review.

As to the Act's requirements that physicians provide accurate and situationally appropriate information to patients and that they refer patients whom they are unwilling to treat, these requirements survive intermediate scrutiny, *see* Part II.B.1.b *supra*, and even survive strict scrutiny, *see* Part II.B.1.c *supra*, as explained in detail above. Thus, they satisfy a rational basis analysis.

As to Plaintiffs' allegation that the Act clarifies that participation may not be the basis for a professional misconduct report but does not make an equivalent statement for refusal to participate, Compl. at ¶ 156, this distinction also survives rational basis review. Participating in medical aid in dying was formerly a crime in New Mexico, and as Plaintiffs allege, would have previously subjected practitioners to censure within the medical community. *See* Compl. at ¶¶ 3–5. As a consequence, the State used a rational means (*i.e.*, clarifying that services under the Act are not professional misconduct) to facilitate a legitimate interest (*i.e.*, ensuring that providers would not face disciplinary action for availing themselves of a new law). There is simply no improper discrimination in this provision. *See also* § 24-7C-7(A) (making clear that protections from disciplinary action extend to both participating *and* refusing to participate in providing medical assistance with death).

### c.  *Even if strict scrutiny applied, dismissal would still be proper.*

Plaintiffs still argue for strict scrutiny. They present a layered theory: because *some* doctors have religious reasons for opposing medical aid in dying, and because the Act contains different provisions for *all* doctors who oppose medical aid in dying compared to all doctors who do not, the Act must trigger strict scrutiny. Compl. at ¶¶ 153–59; *see also* PI Motion at 25. This theory is unsupported.

Legislation challenged on equal protection grounds "is presumed to be valid" and receives strict scrutiny only when it expressly classifies citizens according to a suspect category or when it "impinge[s] on personal rights protected by the Constitution." *City of Cleburne*, 473 U.S. at 440. The Act draws no suspect distinctions. *See* Section II.B.4.a *supra*. Neither does it "impinge on personal

rights" simply because religious beliefs constitute one of the reasons that some conscientious objectors oppose providing medication under the Act.

First, the statutes that have merited strict scrutiny due to an imposition on personal rights have involved the *direct* regulation of these rights. *See Cleburne*, 473 U.S. at 440. For example, *Kramer v. Union Free School District No. 15*, 395 U.S. 621, 624–26 (1969), applied strict scrutiny to a law that limited eligibility to vote. *See also Carrington v. Rash*, 380 U.S. 89, 96 (1965) (same); *Reynolds v. Sims*, 377 U.S. 533, 560–62 (1964) (same). In *Shapiro v. Thompson*, 394 U.S. 618 (1969), *overruled on other grounds, Edelman v. Jordan*, 415 U.S. 651 (1974), the Court applied heightened scrutiny where the "specific objective" of the challenged law was to prevent migration among the several states, in frustration of federal freedoms to travel. *Id.* at 627–31. In *Skinner*, 316 U.S. at 541, the Court applied strict scrutiny to forced sterilization laws, due to their direct deprivation of the right to procreate. There is simply no parallel here, where the Act does not directly regulate any religious exercise or other fundamental right.

Second, the Act does not even *indirectly* discriminate on the basis of religion. Plaintiffs have made clear that there are both religious and secular reasons that they themselves object to the Act, and that there are many outside the religious community who object to the ethics, social policy, and medical efficacy of medicine-assisted death. *See* PI Motion 6–9, 18. Thus, the reasons that providers will opt into or out of various portions of the Act are not purely faith based.

Because the Act does not draw suspect classifications, directly regulate religious practice, or rely on religious/secular distinctions, strict scrutiny does not apply. Even if it did, the Act would withstand that review. As explained above, there are several compelling state interests that the challenged portions of the Act serve. Part II.B.1.b–c *supra*. Among others, these interests include facilitating the flow of complete and accurate information between physicians and patients, as well as preserving patients' ability to choose and access their own health care providers. The Act's Requirements to Inform and Refer are narrowly tailored to these important ends. Part II.B.1.c *supra*.

### 5.   Count V States No Impairment of Associational Freedoms.

Count V alleges that the Membership Requirement violates CMDA's First Amendment right to associate, or in this case disassociate. Specifically, Plaintiffs argue that the Act curtails CMDA's freedom to limit membership through the Act's protections from professional censure.

### a.   *Plaintiffs' allegations invoke a rational basis review.*

The Membership Requirement prevents associations from ousting members on the sole basis of their refusal to provide medical aid in death. It offers the same protection to members who do opt to provide this assistance. Relying exclusively on *Boy Scouts of America v. Dale*, 530 U.S. 640, 648 (2000), Plaintiffs allege that the Act limits expressive association by forcing CMDA to include members it does not want. There are two requirements for showing that a forced inclusion meaningfully limits expressive association: (i) the affected "group must engage in some form of expression," and (ii) "the forced inclusion … would significantly affect the [group's] ability to advocate." *Id.* at 648–50.

Taking as true the complaint's allegations, Plaintiffs have stated facts to support the first requirement. While the conclusory statement that CMDA "is an expressive association" need not be credited, *Kan. Penn*, 656 F.3d at 1214, the complaint's fact allegations about CMDA's purposes—that it exists for "the collective expression and propagation of shared ethical, moral, and religious ideals" and "seeks to express . . . belief[s] about the sanctity of life"—satisfy *Dale*'s first requirement. Compl. at ¶¶ 18–26, 166; *see Dale*, 530 U.S. at 649–50.

But Plaintiffs have not alleged facts showing that the inclusion of members who participate in providing medication under the Act would "significantly affect" CMDA's advocacy. Plaintiffs offer only conclusory statements that their advocacy would suffer, but provide no facts in support. *See Kan. Penn*, 656 F.3d at 1214. In contrast to *Dale*, where the excluded individual wished to occupy a leadership position within the organization while actively engaging in advocacy outside the organization, Plaintiffs here have alleged no facts to suggest that the practitioners they wish to exclude

would alter or impede their message. In fact, Plaintiffs have not identified any CMDA members who even desire to provide services under the Act—much less any such members who are in CMDA leadership, who are engaging in advocacy in favor of the Act, or who are otherwise complicating CMDA's advocacy plans. *See* Compl. at ¶¶ 163–73. This is insufficient to implicate expressive association and strict scrutiny. *See Dale*, 530 U.S. at 653–54 (explaining that "*Hurley* [*v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Boston, Inc.*, 515 U.S. 557 (1995)] is illustrative . . . . We noted that parade organizers did not wish to exclude the GLIB members because of their sexual orientations, but because they wanted to march behind a GLIB banner," a plan that would effectively force parade organizers "to *propound* a particular point of view" (emphasis added)).

### b. *The facts alleged do not give rise to a cognizable claim under either rational basis review or strict scrutiny.*

The state has an interest in ensuring that its health care providers are able to render medical services in accordance with their best judgment, expertise, and conscience and without undue influence from insurance companies or professional associations. *See* § 24-7C-7(B). In other words, New Mexico physicians' animating concern must be their obligation to their patients, not to third-party entities, and any limits on their practices must be set by state law and prevailing standards of care, not by pressures from trade organizations or insurers. Preserving these freedoms and focuses in patient care is a compelling state interest. The Membership Requirement is the provision that prevents employers (like health care entities and providers) and other service-providing entities (including insurance companies and managed care organizations) from exerting power over an individual physician's choice to participate or *not* participate in the Act. It also ensures that professional organizations cannot oust members exclusively because of lawful patient-care choices—a sufficiently tailored means of serving state interests. Plaintiffs' Count V should be dismissed along with the others.

## III.   CONCLUSION

For the reasons above, Attorney General Torrez respectfully requests this suit be dismissed.

Respectfully Submitted:

RAÚL TORREZ
New Mexico Attorney General

By: */s/ Kelsey Frobisher Schremmer*
Mark W. Allen, AAG
Kelsey Frobisher Schremmer, AAG
Office of the New Mexico Attorney General
408 Galisteo Street
Santa Fe, NM 87501
(505) 490-4060
mallen@nmag.gov
kschremmer@nmag.gov

## CERTIFICATE OF SERVICE

I hereby certify that on March 10, 2023, I filed the foregoing document electronically via the

CM/ECF electronic filing system, which caused service to all counsel of record.

*/s/ Kelsey Frobisher Schremmer*