IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

MARK LACY M.D. and CHRISTIAN
MEDICAL & DENTAL
ASSOCIATIONS,

        Plaintiffs,

v.

Case No. 1:22-cv-00953-MIS-KK

RAÚL TORREZ, in his official
capacity as Attorney General of the
State of New Mexico, *et al.*,

        Defendants.

## DEFENDANT ATTORNEY GENERAL RAÚL TORREZ'S RESPONSE TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

COMES NOW Defendant Raúl Torrez, in his capacity as Attorney General of the State of New Mexico, and for his Response to Plaintiffs' Motion for Preliminary Injunction, filed January 30, 2023 [Doc. 20], states as follows:

### I.    INTRODUCTION

#### A.  GOVERNING STANDARDS

Preliminary injunctions are extraordinary remedies that require a movant's rights to be clear and unequivocal. *Planned Parenthood of Kan. v. Andersen*, 882 F.3d 1205, 1223 (10th Cir. 2018). They have a "limited purpose" and exist "'merely to preserve the relative positions of the parties until a trial on the merits can be held[.]'" *Schrier v. Univ. of Colo.*, 427 F.3d 1253, 1258 (quoting *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1982)). As a consequence, preliminary injunctions that alter the status quo are particularly "disfavored," and they "must be more closely scrutinized to assure that the exigencies of the case support the granting of a remedy that is extraordinary even in the normal course." *O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft*, 389 F.3d 973, 975 (10th Cir. 2004) (en banc), *aff'd and*

*remanded sub nom.*, *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418 (2006). Parties seeking a disfavored injunction "are not entitled to rely on [the Tenth] Circuit's modified-likelihood-of-success-on-the-merits standard" that permits a party to make a lesser showing of likely success where the balance of harms tips in its favor. *O Centro*, 389 F.3d at 975–76. For such a preliminary injunction to be granted, movants must establish that: (i) the movants are likely to succeed on the merits; (ii) the movants are substantially likely to suffer irreparable harm absent such injunction; (iii) the balance of equities tips in the movants' favor; and (iv) an injunction is in the public interest. *See Winter v. Nat. Res. Def. Couns., Inc.*, 555 U.S. 7, 20 (2008); *Mrs. Fields Franchising, LLC v. MFGPC*, 941 F.3d 1221, 1232 (10th Cir. 2019). "The third and fourth . . . factors 'merge' when the government is the party opposing the injunction." *Nken v. Holder*, 556 U.S. 418, 435 (2009). If a movant fails to establish a likelihood of success, then the court generally need not consider the remaining factors. *See Warner v. Gross*, 776 F.3d 721, 724 (10th Cir. 2015) ("Having concluded that the plaintiffs failed to establish a significant possibility of success on the merits[, we] deny their . . . motion[.]").

Plaintiffs here seek to alter the status quo by enjoining a New Mexico law that has been in effect since June 18, 2021—well over a year before this present action was filed. *See Dominion Video Satellite, Inc. v. EchoStar Satellite Corp.*, 269 F.3d 1149, 1155 (10th Cir. 2001) ("[T]he status quo is 'the last uncontested status between the parties which preceded the controversy until the outcome of the final hearing.'" (quoting *SCFC ILC, Inc. v. Visa USA, Inc.*, 936 F.2d 1096, 1100 n.8 (10th Cir. 1991)).

**B. FACTUAL BACKGROUND**

Plaintiffs are Dr. Mark Lacy, a New Mexico physician, and the Christian Medical and Dental Association ("CMDA"), a national organization of Christian health care providers.[1] Together, they challenge the constitutionality of several provisions of, and definitions within, the New Mexico End-of-Life Options Act, NMSA 1978, §§ 24-7C-1 to -8 (the "Act"). The Act provides a rigorous

---
[1] For purposes of this Response, the facts presented are taken directly from Plaintiffs' Complaint, ECF No. 1.

2

procedure by which individuals who are suffering from terminal illness may, under limited circumstances, request and receive medical aid in dying. Plaintiffs claim that certain definitions within the act are unconstitutionally vague, and that three substantive requirements of the Act infringe on their religious, speech, and association rights under the First and Fourteenth Amendments of the United States Constitution.

The first contested provision requires providers treating terminally ill patients to inform them of all legal options that are reasonable for the patient:

> A health care provider shall inform a terminally ill patient of all reasonable options related to the patient's care that are legally available to terminally ill patients that meet the medical standards of care for end-of-life care.

Section 24-7C-6 (the "Requirement to Inform"). The second is a requirement that applies to conscientious objectors (such as Dr. Lacy) who are unwilling to provide aid in dying to refer patients to other providers:

> No health care provider who objects for reasons of conscience to participating in the provision of medical aid in dying shall be required to participate in the provision of medical aid in dying under any circumstance. If a health care provider is unable or unwilling to carry out an individual's request pursuant to the End-of-Life Options Act, that health care provider shall so inform the individual and refer the individual to a health care provider who is able and willing to carry out the individual's request or to another individual or entity to assist the requesting individual in seeking medical aid in dying. If the health care provider transfers the individual's care to a new health care provider, the prior health care provider shall transfer, upon request, a copy of the individual's relevant medical records to the new health care provider.

Section 24-7C-7(C) (the "Requirement to Refer"). The third contested provision prohibits, in relevant part, professional associations from denying membership to or censuring health care providers based on their participation in medical aid in dying:

> A . . . professional organization or association . . . shall not subject a person to censure, discipline, suspension, loss or denial of . . . privileges of membership or other penalty for participating, or refusing to participate, in the provision of medical aid in dying in good faith compliance with the provisions of [the Act].

Section 24-7C-7(B) (the "Membership Requirement").

Neither Dr. Lacy nor CMDA has faced any enforcement action or credible threat of enforcement since the enactment of the Act nearly two years ago. Dr. Lacy has refused to comply with the Requirements to Inform or Refer, and has no intention of complying with them in the future. Compl., ¶¶ 38, 40, 44. CMDA has likewise never been compelled to alter its membership as a result of the Membership Requirement and has not alleged any intent to deviate from its membership practices in the future. *See* Compl., ¶¶ 31–32. Despite this, CMDA has also not faced any enforcement action or threat of enforcement action. Nonetheless, they have sued the State's Department of Health along with Attorney General Raúl Torrez and each member of the State's Board of Medicine—in their official capacities—to seek prospective injunctive relief against any enforcement.[2]

## II. ARGUMENT AND AUTHORITIES

### A. PLAINTIFFS HAVE FAILED TO DEMONSTRATE A SUBSTANTIAL LIKELIHOOD OF SUCCESS ON THE MERITS OF THEIR CLAIMS

#### 1. Plaintiffs Lack Standing To Proceed

As a preliminary matter, Plaintiffs lack standing to pursue these claims, and the Court need not inquire further. The arguments and authorities on standing from Attorney General Torrez's Motion to Dismiss, filed March 10, 2023, (the "MTD") [Doc. 44] are incorporated herein by reference. Fed. R. Civ. P. 10(c) (permitting incorporation of a prior submission).

#### 2. Plaintiffs Are Unlikely To Succeed On The Merits Of Their Claims

##### a. *Plaintiffs are not able to establish their free speech claims in Count I*

###### a. *Intermediate scrutiny applies*

As a general matter, the regulation of commercial speech is met with lesser than strict scrutiny. *Florida Bar v. Went For It, Inc.*, 515 U.S. 618, 623 (1995) (describing intermediate scrutiny and recognizing that commercial speech receives only this "limited measure of protection" because "[w]e

---

[2] The Attorney General would be immune under the Eleventh Amendment from any other type of relief. U.S. Const. amend. XI; *Edelman v. Jordan*, 415 U.S. 651, 662–63 (1974); *Wagoner Cnty. Rural Water Dist. No. 2 v. Grand River Dam Auth.*, 577 F.3d 1255, 1258 (10th Cir. 2009).

have always been careful to distinguish commercial speech from speech at the First Amendment's core"). In *National Institute of Family and Life Advocates v. Becerra*, 138 S. Ct. 2361, 2371–75 (2018) ("*NIFLA*"), the Court confirmed that "more deferential review" still applies to commercial speech and to the "regulat[ion of] professional conduct, even though that conduct incidentally involves speech. *Id.* at 2373. Even when professionals engage in noncommercial speech, strict scrutiny will only apply to regulation that is content-based rather than content-neutral. Content-based laws are those prohibit speech based on "communicative content" or those that alter speech by "compelling individuals to speak a particular message." *Id.* at 2371; *see also Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 168 (2015). As a matter of law, the Act does neither.

First, the Act does not impermissibly compel speech. Speech is not compelled, within the meaning of constitutional freedom, when professionals are required "to disclose factual, noncontroversial information in their 'commercial speech.'" *See NIFLA*, 138 S. Ct. at 2372. Nor do laws impermissibly infringe when they "regulate professional conduct, even though that conduct incidentally involves speech." *Id.* at 2372–73. Dr. Lacy may have strong feelings about New Mexico's law on medically assisted death, but it is objectively true, and not subject to debate or argument, that New Mexico law permits medical aid in dying. In other words, it is factually accurate, noncontroversial information that patients are entitled, under the law, to seek medical assistance in death. Requiring a physician to provide truthful and accurate information when asked is not an impermissible regulation of professional, commercial speech. *Cf. Milavetz, Gallop & Milavetz, P.A. v. United States*, 559 U.S. 229 (2010) (upholding requirement that attorneys provide certain factual information in advertisements).

Moreover, unlike the offending regulation in *NIFLA*, the Act applies equally to all medical providers, yet does not require one universal message be given to all patients. *Compare* § 24-7C-6, *with NIFLA* 138 S. Ct. at 2372–74. Under the Act, all physicians must exercise their professional judgment in determining the set of options that are reasonable and meet the standard of care, and they may also

share their individual professional opinions—or warnings—on these options. Far from requiring providers to "speak a certain message," the Act requires providers to give patients accurate and complete information while still allowing providers to append whatever "message" they choose to that factual information. Speech is not "compelled" by requiring physicians to inform their patients about available, reasonable, and medically indicated options. *Cf. NIFLA* 138 S. Ct. at 2373 (reiterating the constitutionality of informed consent requirements).

As set forth in the MTD, Part II.B.1.a, the Requirement to Refer likewise does not compel speech. In this regard, the Act significantly differs from the one at issue in *CMDA v. Bonta*, Case No. 5:22-cv-335-FLA(GJSx) (the Order addressing the Preliminary Injunction Motion in that case was attached by Plaintiffs as Exhibit A to their Mot. Prelim. Inj. *Bonta* examined the following provision in California's medically assisted death statute:

> If a health care provider is unable or unwilling to participate under this part, … the provider shall, at a minimum, inform the individual that they do not participate in the End of Life Option Act, document the individual's date of request and provider's notice to the individual of their objection in the medical record, and transfer the individual's relevant medical record upon request.

Cal. Health & Safety Code § 443.14(e)(2) (2022). California's statute requires a patient to make two separate requests for medical aid in dying before they will be eligible for medication. *Id.* at § 443.3(a). Thus, in the context of the California statute, this seemingly benign provision held special significance. It made the objecting physician's documentation of "the individual's date of request" as part of the referral process a significant step that would "then be used to satisfy one of the two oral requests required to obtain aid-in-dying medication." *Bonta*, 5:22-cv-335-FLA(GJSx), ECF No. 108, at *20–21 (Sept. 2, 2022). This had the "ultimate outcome . . . that non-participating providers are compelled to participate" in the very process by which patients obtain their life-ending medication. *Id.* There is no parallel requirement in New Mexico's Act, and no similar concerns of compelled speech. *See id.* at *7 (containing CMDA's admission that "they do not object to [California's] requirements that a non-

participating health care provider shall . . . transfer an individual's medical records upon request" and "would not object to the documentation requirement if it did not count as one of the two oral requests for a qualifying individual to obtain aid-in-dying drugs").

Second, the Act is content neutral. The Requirement to Inform ensures only that providers give accurate and complete information about treatment options that are reasonable, legal, *and* meet the standard of care. Section 24-7C-6. Plaintiffs advance a contorted reading of this plain language, arguing that this provision "deems assisted suicide as meeting the 'medical standards of care.'" Compl. at ¶ 110. To the contrary, the provision allows the information requirement to accommodate developing and evolving standards of care; it does not mandate what any standard of care will be. The provision's plain language leaves to the local medical community any determination of what does and does not satisfy current standards of care. It is certainly conceivable that medically assisted death could now, or in the future, be the standard of care in particular circumstances. However, the state has in no way required or endorsed that outcome by enacting a law that reserves to professionals the development of these standards. In addition, standards of care are just one component of the Requirement to Inform. Before a physician has an affirmative duty under this provision, medically assisted death must also be reasonable under the circumstances—a question of individual fact and of medical judgment. Thus, the provision once again functions narrowly to require only that providers give accurate information that is appropriate to the circumstances—not that they deliver one uniform and universal message on behalf of the state.

*If* required, factual information about the Act is then conveyed in the provider's own words and may be coupled with the provider's additional recommendations, opinions, and warnings. This is a far cry from the pre-written "government-drafted script" on "how [women] can obtain state-subsidized abortions" that providers were mandated to give to all patients in *NIFLA*. 138 S. Ct. at 2369, 2371.

7

Consequently, the Act is not subject to strict scrutiny. Instead, it need only "promote[] a substantial government interest that would be achieved less effectively absent the regulation." *Ward v. Rock Against Racism*, 491 U.S. 781, 798–99 (1989); *see also Florida Bar*, 515 U.S. at 624 ("First, the government must assert a substantial interest in support of its regulation; second, the government must demonstrate that the restriction on commercial speech directly and materially advances that interest; and third, the regulation must be 'narrowly drawn.'").

    ii. *The facts alleged do not give rise to a cognizable claim under any standard*

New Mexico has a compelling interest in those portions of the Act that Count I attacks. Specifically, Dr. Lacy takes issue with (i) the Requirement to Inform patients "of all reasonable options related to the patient's care that are legally available to terminally ill patients that meet the medical standards of care," § 24-7C-6, and (ii) the Requirement to Refer any patient who affirmatively requests medical assistance if he "is unable or unwilling to carry out [that request]," § 24-7C-7. There are several significant government interests at stake in these requirements.

First, New Mexico has a broad interest in regulating the health care profession. *Hill v. Colorado*, 530 U.S. 703, 715 (2000) ("It is a traditional exercise of the States' police powers to protect the health and safety of their citizens." (internal quotation marks and citation omitted)); *Semler v. Or. Bd. of Dental Examiners*, 394 U.S. 608, 612–13 (1935) (recognizing the state's authority to regulate "the vital interest of public health"); *Buchwald v. Univ. of N.M. Sch. of Med.*, 159 F.3d 487, 498 (10th Cir. 1998) (concluding that "public health is a compelling government interest"); *see also Goldfarb v. Va. State Bar*, 421 U.S. 773, 792 (2004) ("We recognize that the States have a compelling interest in the practice of professions within their boundaries, and that as part of their power to protect the public health, safety, and other valid interests they have broad power to establish standards for . . . regulating the practice of professions."); *State ex rel. Whipple v. Martinson*, 256 U.S. 41, 45 (1921) ("The right to exercise this power [to regulate the prescription of habit-forming medication] is so manifest in the interest of the public

8

health and welfare, that it is unnecessary to enter upon a discussion of it . . . ."). More specifically, New Mexico has an interest in ensuring that its health care providers engage in candid, accurate communication with patients. As the Supreme Court recognized in *NIFLA*, "Doctors help patients make deeply personal decisions, and their candor is crucial." 138 S. Ct. at 2374. Completeness and context are integral to honest, accurate communication, and New Mexico has an interest in making sure citizens are met with nothing less in their doctors' offices.

Second, New Mexico has an interest in preventing misinformation about state laws. Doctors occupy positions of extreme trust and speak with widely-recognized authority. The State has an interest in making sure that the manner in which they respond to patient inquiries accurately represents the law and does not artificially restrict access to information or resources. *Cf. Goldfarb*, 421 U.S. at 792.

Third, New Mexico has an established interest in requiring informed consent. *See NIFLA*, 138 S. Ct. at 2373 (describing this requirement as "firmly entrenched" in the law). If providers withhold information about reasonable, available options that meet the prevailing standard of care, then any resulting consent to treatment is not fully informed.

Fourth, New Mexico has an interest in promoting access to medical services, including through timely, appropriate referrals. *See Buchwald*, 159 F.3d at 498 (describing the interest in "needed medical care to underserved areas" as "not only legitimate, but also compelling" and favorably citing precedent in support of the "State's interest in facilitating the health care of its citizens"); *cf. Hill*, 530 U.S. at 715 (recognizing the legitimacy of a state's interest in "unimpeded access to health care facilities").

Fifth, New Mexico has an interest in promoting cooperative, positive relationships between patients and health care providers. There may be situations in which a provider's closely held beliefs conflict with a patient's permissible health care goals, and in those situations the state has an interest

9

in supporting both the provider's beliefs and the patient's goals via an effective and accessible system of referrals. *Cf. Hill*, 530 U.S. at 715.

The Act is narrowly tailored to serve these compelling state interests. The Requirement to Inform provides that, in order to provide medical aid in dying, a provider must first inform the patient of "all reasonable options legally available to terminally ill patients that meet the medical standard of care for end-of-life care." Section 24-7C-6. Contrary to Plaintiffs' assertions, this provision does *not* require that a specific, state-sponsored message be conveyed to each patient. It merely requires that doctors discuss all options that are (1) reasonable, (2) legally available, and (3) meet the appropriate medical standard of care. Requiring that providers convey options that are reasonable and meet the standard of care simply requires them to provide medical advice to their patients, which they are already required to do. Adding that the options must be legally available likewise imposes no legally cognizable burden on providers. A plain reading of the Requirement to Inform shows that it serves as a caution to providers that they must inform a patient who has requested medical aid in dying of all of the other available options for treatment. This is essential to vindicating the compelling state interest of ensuring that those who choose medical aid in dying do so with fully-informed consent.

The Requirement to Refer is even more limited. The Referral Requirement is only triggered when a patient *affirmatively requests* medication that a provider is unwilling to prescribe. *See* § 24-7C-7(C). In other words, the Requirement to Refer is narrowly tailored to those situations where an adult patient has already taken the voluntary step of requesting medical intervention to which they may be legally entitled. Providers need only to respond with honest factual information (that they are unwilling to carry out the request) and relinquish the relationship to another provider. The requirement to refer patients that you are not willing or able to treat is not an impermissible burden to providers, who are otherwise obligated to transfer patient care under these circumstances. *See* American Medical Association, *Code of Medical Ethics* 1.1.5 ("When considering withdrawing from a case, physicians must

[f]acililtate transfer of care when appropriate."); 16.10.8.9(A) NMAC (adopting the standards of the American Medical Association *Code of Medical Ethics* for New Mexico physicians and surgeons).

Plaintiffs are unlikely to prevail on Count I because the Act easily satisfied rational basis review. Furthermore, because these provisions serve a compelling state interest and are narrowly tailored to achieve that end, Plaintiffs are unlikely to prevail on Count I.

### b. *Count II states no colorable infringement on Free Exercise*

Count II alleges that the same Requirements to Refer and Inform also violate Plaintiffs' First Amendment free exercise rights, by treating providers who object to the Act on religious grounds less favorably than other providers. As more fully set forth in the MTD, Plaintiffs are unlikely to succeed on this claim.

The Act is a neutral law of general applicability; it does not target or directly regulate religious practice. Laws are neutral toward religion unless they "proceed[] in a manner intolerant of religious beliefs or restrict[] practices *because* of their religious nature." *Fulton v. City of Philadelphia*, 141 S. Ct. 1868, 1877 (2021) (emphasis added). Laws are "generally applicable" unless they "selective[ly] . . . impose burdens only on conduct motivated by religious belief." *Lukumi*, 508 U.S. at 543. Laws, such as the Act, that meet these criteria are evaluated under rational basis review. *Fulton*, 141 S. Ct. at 1876.

Because the Act is neutral and generally applicable, strict scrutiny does not apply. First, the Act is facially neutral toward religion because it makes no reference to religious practices and does not attempt to directly regulate religious exercise. Second, it is neutral in its application and effect because it does not infringe on or restrict conduct *because of* its religious motivation. Third, the Act is one of general applicability because it does not discern between religious and secular practices or burden religious objectors differently than nonreligious objectors. *See Lukumi*, 508 U.S. at 533–34. As more fully set forth above and in the MTD, Part II.B.1.c, the Requirements to Refer and Inform are narrowly

11

tailored to serve a compelling state interest. They therefore satisfy the less rigorous rational basis standard.

### c. *Plaintiffs are unlikely to prove the alleged due process violation in Count III*

In Count III, Plaintiffs allege that the Act violates their due process rights. This claim is limited to the allegation that certain terms within the Act are unconstitutionally vague and ambiguous, such that "no reasonable person in [Plaintiffs'] position could understand." Compl. ¶¶ 138–39.

Statutes are not constitutionally void for vagueness unless their terms effectively prevent "ordinary people" from obtaining "fair notice of the conduct . . . proscribe[d]." *Sessions v. Dimaya*, 138 S. Ct. 1204, 1212 (2018). This analysis presumes "people of ordinary intelligence" and requires nothing more than a "reasonable opportunity to understand." *Dr. John's, Inc. v. City of Roy*, 465 F.3d 1150, 1158 (10th Cir. 2006). As set forth more fully in the MTD, Part II.B.3, the portions of the Act at issue use terms that are in common use elsewhere in the law and medical practice, are clearly understood by Plaintiffs themselves, and certainly provide fair notice of the conduct proscribed.

### d. *Plaintiffs are unlikely to prove their equal protection claims in Count IV*

In Count IV, Plaintiffs claim that the Act fails to provide equal protection under the law because it treats different types of behavior differently. This state of affairs, inherent in every law, does not invoke heightened review and does not endanger Plaintiffs' fundamental rights. *Cf. Skinner v. Oklahoma*, 316 U.S. 535, 539–40 (1942) ("[T]he claim that state legislation violates the equal protection clause of the Fourteenth Amendment is the usual last resort of constitutional arguments. [T]he States in determining the reach and scope of particular legislation need not provide abstract symmetry. They may mark and set apart the classes and types of problems according to the needs and as dictated or suggested by experience." (internal quotation marks and citation omitted)). Legislation challenged on equal protection grounds "is presumed to be valid" and receives strict scrutiny only when it expressly classifies citizens according to a suspect category or when it "impinge[s] on personal rights protected

by the Constitution." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 440 (1985). Plaintiffs contend that the Act violates the Fourteenth Amendment's guarantee of equal protection because it creates separate categories of physicians. First, it separates those "who are willing to facilitate . . . assisted suicide [from] similarly situated physicians who are not." Compl., ¶ 153. Second, it distinguishes between those "who refuse to participate in assisted suicide but are willing to refer for and provide information about it, and similarly situated physicians who refuse to participate and are unwilling to refer for and provide information about it." Compl., ¶ 154. These are not suspect classifications. *See City of Cleburne.*, 473 U.S. at 440. Thus, rational basis review applies. *Id.* at 441–42.

In addition to the reasons cited in Parts II.B.1–3 *supra*, the Act survives rational basis review because it does not even *indirectly* discriminate on the basis of religion. In fact, Plaintiffs themselves have made clear that there are both religious and secular reasons that they object to the Act, and that there are many outside the religious community who object to the ethics, social policy, and medical efficacy of medicine-assisted death. *See* Pl.'s Mot. Prelim. Inj. at 6–9, 18 [Doc. No. 20]. Thus, the reasons that providers might opt into or out of various portions of the Act would not be purely faith-based. Because religious objections are treated identically with other moral and ethical objections, there is no basis upon which an Equal Protection claim might proceed. *See SECSYS, LLC v. Vigil*, 666 F.3d 678, 684 (10th Cir. 2012) ("[The Equal Protection Clause] seeks to ensure that any classifications the law makes are made without respect to persons, that like cases are treated alike, that those who appear similarly situated are not treated differently without, at the very least, a rational reason for the difference." (internal quotation marks and citation omitted)).

### e. *Plaintiffs are unlikely to prove their freedom of association claims in Count V*

Plaintiffs' final count, Count V, alleges that the Membership Requirement violates CMDA's First Amendment right to associate, or in this case disassociate. Specifically, Plaintiffs argue that the

Act curtails CMDA's freedom to limit membership through the Act's protections from professional censure.

The Membership Requirement prevents associations from ousting members on the sole basis of their refusal to provide medical assistance in death and offers the same protection to members who do opt to provide this assistance. Plaintiffs allege that the Act limits expressive association by forcing CMDA to include members it does not want. There are two requirements for showing that a forced inclusion meaningfully limits expressive association: (i) the affected "group must engage in some form of expression," and (ii) "the forced inclusion . . . would significantly affect the [group's] ability to advocate." *Id.* at 648–50. Plaintiffs have not alleged facts showing that the inclusion of members who participate in providing medication under the Act would "significantly affect" CMDA's advocacy. Plaintiffs offer only conclusory statements that their advocacy would suffer, but provide no facts in support. *See Kan. Penn Gaming, LLC v. Collins*, 656 F.3d 1210, 1214 (10th Cir. 2011). In *Boy Scouts of America v. Dale*, 530 U.S. 640 (2007), the excluded individual wished to occupy a leadership position within the organization while actively engaging in advocacy outside the organization. Here, Plaintiffs have alleged no facts to suggest that being required to include the practitioners they wish to exclude would alter or impede CMDA's message. In fact, Plaintiffs have not identified any CMDA members who desire to provide services under the Act—much less any such members who are in CMDA leadership, who are engaging in advocacy in favor of the Act, or who are otherwise complicating CMDA's advocacy plans. *See* Compl., ¶¶ 163–73. This is insufficient for the Court to find a limit on CMDA's expressive association and thereby invoke strict scrutiny. *See Dale*, 530 U.S. at 653–54.

The state has an interest in ensuring that its health care providers are able to render medical services in accordance with their best judgment, expertise, and conscience and without undue influence from insurance companies or professional associations. *See* § 24-7C-7(B). In other words, New Mexico physicians' animating concern must be their obligation to their patients, not to third-

party entities, and any limits on their practices must be set by state law and prevailing standards of care, not by pressures from trade organizations or insurers. Preserving the medical profession from these undue influences is a compelling state interest. Ensuring that these organizations cannot oust members exclusively on the basis of lawful patient-care choices is a sufficiently tailored means of serving this state interest.

New Mexico also has an interest in promoting candor between providers and patients. As set forth in Part II.A.2.a, *supra*, this is a compelling state interest. Ensuring that patients are informed of legal treatment options that meet the standard of care is a vital regulatory function the State performs for its citizens, who need to have trust in the information they receive from their health care providers. This role uniquely belongs to the state, not to professional organizations and associations, which have their own distinct agendas and viewpoints and are under no mandate or obligation to serve the patient population at large. Because of these compelling state interests, the Membership Requirement is very likely to survive rational basis review.

### B. PLAINTIFFS HAVE FAILED TO ESTABLISH A LIKELIHOOD OF SUFFERING IRREPARABLE HARM

To establish that he will suffer irreparable harm, "the movant must demonstrate a significant risk that he or she will experience harm that cannot be compensated after the fact by money damages." *First W. Capital Mgmt. Co. v. Malamed*, 874 F.3d 1136, 1141 (10th Cir. 2017) (internal quotation marks and citation omitted). "[C]ourts have consistently noted that because a showing of probable irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction, the moving party must first demonstrate that such injury is likely before the other requirements" will be considered. *Dominion Video Satellite, Inc. v. Echostar Satellite Corp.*, 356 F.3d 1256, 1260 (10th Cir. 2004) (internal quotation marks and citation omitted). Demonstrating irreparable harm is "not an easy burden to fulfill." *Greater Yellowstone Coal. v. Flowers*, 321 F.3d 1250, 1258 (10th Cir. 2003). "To constitute irreparable harm, an injury must be certain, great, actual and not theoretical." *Heideman v. S.*

15

*Salt Lake City*, 348 F.3d 1182, 1189 (10th Cir. 2003) (internal quotation marks and citation omitted). In short, Plaintiffs must not merely establish that the rights at stake are important, but that, absent the injunction, the hypothetical enforcement of the statute during "the time it will take to litigate this case in district court will [make] it difficult or impossible to resume their activities or restore the status quo ante in the event they prevail." *Id.* Moreover, although deprivation of a constitutional right for even a short period can be an irreparable harm, a movant must establish that they are likely to succeed on the merits of those claims in order to establish a likelihood of irreparable harm. *See Legacy Church, Inc. v. Kunkel*, 455 F. Supp. 3d 1100 (D.N.M. 2020) (discussing treatment of allegations of constitutional violations and holding that, where movants failed to establish likelihood of success, the irreparable harm factor weighed against movants as well).

Plaintiffs assert that they have not changed and will not change any of their behavior in response to the Act. As a result, the Act creates no "chilling effect," and Plaintiffs' harms are limited to the harms arising out of a hypothetical enforcement action. In the event of such an action, Plaintiffs would have a forum to raise these constitutional defenses. As a result, Plaintiffs' alleged harms have an adequate remedy at law and are, by definition, not irreparable. *Heideman*, 348 F.3d at 1189. Plaintiffs will suffer no legally-cognizable harm if the Motion is denied, much less an irreparable one. As a result, this factor weighs heavily against Plaintiffs.

Further, it is well established that "delay in seeking preliminary relief cuts against finding irreparable injury." *Fish v. Kobach*, 840 F.3d 710, 753 (10th Cir. 2016) (citation omitted); *see also Bray v. Bd. of Regents of Univ. of N.M.*, 2000 WL 36739415, at *3 (D.N.M. Nov. 30, 2000) (finding that the irreparable harm factor weighed against the movant due to the movant's delay in filing the motion). Plaintiffs offer no explanation to the Court as to why they waited over a year and a half to raise the claims set forth in their Complaint, which the Court should weigh heavily against their claims of

irreparable harm. *Cf. Fish*, 840 F. 3d at 753 (noting that, while delay alone is not dispositive, a court must consider the reason for the delay as a factor in irreparable harm analysis).

### C. THE BALANCE OF EQUITIES AND PUBLIC INTEREST WEIGH SUBSTANTIALLY AGAINST GRANTING AN INJUNCTION

"The third and fourth [preliminary injunction] factors 'merge' when the government is the party opposing the injunction." *Nken* 556 U.S. at 435. New Mexico has a compelling interest in enforcing the Act and would suffer irreparable harm if enjoined from doing so. *Maryland v. King*, 567 U.S. 1301, 1303 (2012) ("[A]ny time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury.") (citation omitted). An injunction here would prohibit New Mexico from enforcing substantial portions of the Act, not only against persons situated similarly to Plaintiffs, but also against providers who violate the contested provisions of the Act in other ways, such as by failing to fully inform terminally ill patients of treatment options *other than* medical aid in dying. An injunction at this stage would completely divest the State of New Mexico from its ability to regulate patient care at a crucial point in the treatment process. New Mexico's citizens depend on the State's vigilant regulation in this area to ensure they have access to the care they need and are informed of all legally-available treatment options. This substantial harm to the public weighs substantially against granting the requested injunction.

The comparative harms to the parties demonstrate that an injunction is not prudent or warranted. One the one hand, Plaintiffs allege a hypothetical and speculative harm that is allegedly likely to manifest during the pendency of this case, even though no such harm has manifested in the nearly two years prior to filing the Complaint. On the other hand, New Mexico would be effectively unable to enforce a law of general applicability, therefore denying New Mexico patients and providers important protections when addressing end-of-life care. New Mexico's substantial interests in

17

enforcing its own legislation and regulating the practice of medicine within the state substantially outweigh Plaintiffs' interest in forestalling a completely speculative deprivation of their rights.

### III. CONCLUSION

In conclusion, Raúl Torrez, in his official capacity as New Mexico Attorney General, asks that Plaintiffs' Motion be denied and for such further relief as is just and proper in the circumstances.

Respectfully Submitted:

RAÚL TORREZ
New Mexico Attorney General

By: */s/ Mark W. Allen*
Mark W. Allen
Kelsey Frobisher Schremmer
Assistant Attorneys General
Office of the New Mexico Attorney General
408 Galisteo Street
Santa Fe, NM 87501
(505) 490-4060
mallen@nmag.gov
kschremmer@nmag.gov
*Counsel for Defendant Raúl Torrez, in his Official Capacity as Attorney General for the State of New Mexico*

### CERTIFICATE OF SERVICE

I hereby certify that on March 10, 2023, I filed the foregoing document electronically via the CM/ECF electronic filing system, which caused service to all counsel of record.

*/s/ Mark W. Allen*
Mark W. Allen, Esq.